UNITED STATES of America,

v.

The LaROUCHE CAMPAIGN, Independent Democrats for LaRouche, Campaigner Publications, Inc., Caucus Distributors, Inc., Lyndon H. LaRouche, Paul Goldstein, Jeffrey Steinberg, Michelle Steinberg, Robert Greenberg, Edward Spannaus, John Scialdone, National Caucus of Labor Committees, Defendants.

Crim. No. 86–323–K.

United States District Court,
D. Massachusetts.

Aug. 10, 1988.

Odin P. Anderson, Anderson & Associates, P.C., Boston, Mass., for Lyndon LaRouche, Jr.

Michael W. Reilly, Hausserman, Davison & Shattuck, Boston, Mass., for Nat. Caucus of Labor Committees.

Daniel S. Alcorn, Fensterwald & Alcorn, Arlington, Va., for Paul Goldstein.

Matthew H. Feinberg, Boston, Mass., for Caucus Distributors, Inc. and Campaigner Publications, Inc.

William B. Moffitt, William B. Moffitt & Associates, Alexandria, Va., for Jeffrey Steinberg.

Thomas Shapiro, Shapiro & Grace, Boston, Mass., for The LaRouche Campaign and Independent Democrats for LaRouche.

Mayer Morganroth, Southfield, Mich., for Edward Spannaus.

Robert F. Collins, Braintree, Mass., for Robert Greenberg.

James E. McCall, Boston, Mass., for John Scialdone.

William Cummings, Alexandria, Va., for Michelle Steinberg.

KEETON, District Judge.

Circumstances giving rise to the need for an evidentiary hearing concerning Ryan Quade Emerson ("Emerson") arose while this case was in trial. (A mistrial was subsequently declared after four jurors were excused on defendants' joint motion.) The specific circumstances involved are described more fully in a separate Memorandum and Order of this court dated April 8, 1988 and in the Findings of Fact of the present date.

After the completion of the Emerson Hearing, the parties were invited to submit proposed findings of fact as well as briefs on the substantive issues of whether (and, if so, to what extent) the government violated any obligations of disclosure, whether defendants were prejudiced by any disclosure violations that could be determined, and what an appropriate remedy would be to correct any prejudice demonstrated or to deter future violations of disclosure obligations. Defendants filed a Memorandum

Re: Emerson (Docket No. 1594) and the government filed a Final Submission Regarding Ryan Emerson (Docket No. 1602). This Memorandum responds to these submissions.

Part I addresses the government's duties of disclosure exclusive of Emerson's status as a government witness at trial. Part II addresses the government's duties of disclosure stemming from Emerson's status as a proposed government witness at trial. Part III summarizes conclusions regarding which disclosure obligations were violated, what information would have been available to defendants had the government complied with its obligations, and when defendants were entitled to receive the information the government was obligated to disclose. Part IV addresses the extent of the prejudice suffered by defendants in light of the conclusions summarized in Part III. Finally, Part V addresses the issue of remedies.

## I. DISCLOSURE DUTIES EXCLUSIVE OF EMERSON'S STATUS AS A GOVERNMENT WITNESS

Defendants argue that the government violated several duties of disclosure with regard to evidence about Emerson exclusive of those obligations associated with Emerson's status as a proposed government witness. These include violation of the obligation (A) to disclose exculpatory evidence in accordance with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963), and its progeny, (B) to make disclosures in accordance with Rule 16 of the Federal Rules of Criminal Procedure, (C) to disclose the identity of "informants" under *United States v. Roviaro*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and its progeny, and (D) to disclose evidence pursuant to court order. I address each of these contentions in order.

### A. *Brady Obligations*

1. The Standard for Determining Brady Obligations

(a) *The Basic Elements of a Brady Violation*

■ In *Brady v. Maryland,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1197. It follows that a violation of *Brady* involves three elements: (1) "suppression" by the prosecution of evidence that is both (2) favorable to the accused (exculpatory evidence) and (3) "material" to guilt or punishment.

### (1) Suppression

■ Implicit in the concept of "suppression" is the idea that the prosecution possesses, or constructively possesses, the evidence at issue. The government does not have a duty to seek out exculpatory evidence not in its possession or constructive possession, *United States v. Beaver,* 524 F.2d 963, 966 (5th Cir.1975), *cert. denied,* 425 U.S. 905, 96 S.Ct. 1498, 47 L.Ed.2d 756 (1976), and failure to disclose evidence the government does not have is not "suppression" of evidence. For this reason, it becomes necessary in some cases to discuss the scope of the prosecutor's duty to search for evidence in the files of other offices and agencies of the federal government. This court's Memorandum and Order of April 8, 1988 tentatively defined the scope of the search required at pages 36–37. Neither the government nor the defendants have called to my attention precedent supporting a different conclusion, and I adopt for purposes of this Memorandum the tentative view expressed earlier.

Under the view tentatively stated April 8 and adopted here, I conclude that all of the evidence that is referred to in this Memorandum was within the constructive possession of the government as defined by the scope of the government's duty to search. Issues presented in the Emerson Hearing do require, however, further attention to the legal issues relevant to determining the time when a *Brady* obligation of disclosure arises and the need for precise articulation of a basis for the claim that the evidence is "exculpatory" and "material."

One other matter deserves notice before I turn to those issues. The government has argued that no *Brady* violation arose in this case because no evidence was "suppressed." All of the evidence at issue, it is argued, was turned over voluntarily by the government (in the sense that defendants did not discover it from another source and no court order was necessary) and this was done before the end of trial, which now lies ahead in its entirety after declaration of a mistrial. This point has some force. When acting after trial is completed, reviewing government conduct in the context of a post-trial motion, a court is guided by a distinct body of precedent bearing explicitly on whether a new trial should be ordered. This precedent establishes that late disclosure is not grounds for a new trial where the defendants had an opportunity to make effective use of the evidence at trial. *See, e.g., United States v. Ingraldi*, 793 F.2d 408, 411–12 (1st Cir.1986); *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir.), *cert. denied*, 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976). These are not, however, the circumstances presented here. A new trial has already been ordered, on motion of the defendants to excuse jurors because of disqualification incident to revised estimates of the expected length of the trial.

■ I conclude that if other elements of a *Brady* violation are established, "suppression" occurs not only where the information is never disclosed voluntarily but also where the information is disclosed later than the time when the obligation arose under *Brady. Cf. United States v. Levasseur*, Criminal No. 86–180–Y, slip op. at 35 (D.Mass. May 4, 1988) (Young, D.J.).

Moreover, even if a delayed disclosure were to be regarded as not technically a *Brady* violation when made in time for use at trial without prejudice, it seems most likely that a duty closely analogous to that defined by *Brady* and its progeny will and should be recognized. For these reasons, although the fact that a "voluntary" disclosure has occurred in advance of any court ruling may be relevant to remedy, it does not establish that no violation of any disclosure obligation has occurred.

### (2) Exculpatory Evidence

■ Exculpatory evidence *is* evidence that reasonably supports an inference the defendants seek to have drawn on any issue relevant to their guilt or punishment. Evidence is never exculpatory per se, or in the abstract. Rather, evidence is exculpatory only by reference to issues placed in dispute by substantive criminal law definitions of the offenses charged and any affirmative defenses asserted.

■ Because the meaning of "exculpatory" for any particular claim of a *Brady* violation must be determined in relation to an identifiable issue in the case, it is necessarily implicit in the standard for determining *Brady* obligations that any determination as to whether the government had a *Brady* obligation of disclosure of information at any particular time depends on what was or reasonably should have been known to the appropriate government representative(s) *at that time*. This is so for the reason that one cannot know what issues will be in dispute, under substantive criminal law definitions of the offenses charged and any affirmative defenses asserted, without first knowing enough about the evidence on which the government relies and on which defendants may rely to be able to identify what are the legally relevant issues. From the foregoing point it follows that any determination as to existence or nonexistence of a *Brady* obligation of disclosure must be time-sensitive. It must be made on the basis of what was or should have been known to the government (through its appropriate representatives) at the time when the obligation is claimed to have arisen.

The government, in deciding whether it has an obligation to disclose voluntarily, may at a later time, after it has access to more information bearing upon issues in the case, have a *Brady* obligation to disclose something long in its possession but first identifiable as *Brady* material only when additional evidence revealing new issues has become available to the government. Similarly, a court, in determining

whether a defendant's claim of a *Brady* violation is supported, must examine the question by a time-sensitive standard, or by two or more such standards if it is claimed that as more information came into government hands it bridged any gaps previously existing in the claimed basis for a *Brady* obligation.

For these reasons, with respect to any evidence as to which the defendants contend that a *Brady* obligation has been violated, the court cannot determine whether the claim is valid (and cannot determine that the government had an obligation of disclosure) without first identifying (whether with or without the assistance of defense counsel in articulating their contentions explicitly) a defense theory for which the evidence in question is exculpatory.

### (3) Material Evidence

■ The government's *Brady* obligation attaches only to exculpatory evidence that is "material." It is not clear exactly what "material" means in this context. At the least, it means that the evidence required to be disclosed must be something more than simply exculpatory as defined above. *Brady* is based on the due process clause, and the prosecutor is only required to disclose evidence that, if suppressed, would deprive the defendant of a fair trial. *See United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Because the Supreme Court did not render a majority opinion on the issue of materiality in *Bagley,* the best definition available is that provided in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976): "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence *might have affected the outcome of the trial." Id.* at 104, 96 S.Ct. at 2398 (emphasis added). Evidence is not material, and no *Brady* obligation to disclose it arises, unless it is evidence that "might have affected the outcome of the trial."

### (b) *Articulated Issues and Time–Sensitive Determinations*

At various times during conferences in this case regarding defense claims of *Bra-*

dy violations, the court has invited defense counsel to articulate their *Brady* theories. Defense counsel have responded that they have no obligation to articulate any theory and, in addition, have chosen not to waive their right not to disclose to the government evidence they may offer after the government has rested at the close of its case in chief. Defense counsel's response, which has been repeated in written submissions during the Emerson Hearing, misses the mark because it disregards the necessity for a context of identifiable facts within which to make a determination as to whether particular information does or does not tend to support an inference relevant to a matter placed at issue by the substantive criminal law definitions of the offenses charged and any defenses asserted.

Likewise off the mark, and for the same reason, are the defense contentions, first, that all *Brady* material must be disclosed in advance of the commencement of trial, second, that any evidence that tends to support any one element of a defensive theory must be disclosed pursuant to *Brady* without regard to whether the court (or the government acting "voluntarily") can determine that there will be some evidence bearing upon each other element of that defensive theory sufficient to support submission of the defense to the jury, and, third, that *Brady* requires disclosure of evidence that may lead to the discovery of other evidence not in possession of the government that, together with evidence to which the government has access, might be sufficient to support submission of some defense to the jury.

A central fallacy in all these contentions is the failure to take account of the fact that no determination can be made either that evidence is exculpatory or that it is material unless the person making the determination first has in mind the essential elements of some identified criminal charge or some identified defense.

■ This imperative that the determination of *Brady* obligations be made in a context of some identified criminal charge or defense bears also upon the imperative

of a time-sensitive standard of judgment. Thus, a court deciding a dispute over claimed *Brady* violations must examine the issues from the perspective of a prudent person in the position of the government at the time or times a defendant claims that information should have been disclosed, and on the basis of what was then known or should have been known about the charges, the defenses, and the evidence that was known or should have been known to be available to the defendant in addition to evidence in the government's possession.

It is true, as defendants argue, that in this district Local Rule 42 provides that in all criminal cases, all exculpatory evidence within the meaning of *Brady* "in the possession, custody or control of the parties, the existence of which is known, or by the exercise of due diligence may become known, to the attorneys for the parties, shall be disclosed to the opposing party" in all events within fourteen (14) days after arraignment. Local Rule 42 also recognizes, however, that the duty of disclosure is a continuing one. Local Rule 42(c).

■ The need for a continuing obligation, applicable after as well as before trial commences, arises in part from the fact that some evidence may first come into the possession of the government after trial commences. It arises also, however, from the fact that evidence in the possession of the government from the outset may not be recognizable as exculpatory and material until the government has access to information that comes into its possession at a later time. Thus, it defies common sense to say, as defendants have argued in effect, if not explicitly, that a *Brady* violation occurred where the government did not disclose before commencement of trial information then in its possession but first recognizable as exculpatory only when additional information came into its possession during trial.

■ Defendants are, of course, correct in saying that they cannot be required to waive their right not to disclose in advance their strategy as to what evidence they may offer after the government has completed its case in chief. It does not follow, however, that they are therefore entitled (as they have argued) to have the jury hear during cross-examination of government witnesses, or even after the government has rested, whatever evidence defendants wish to offer that they contend is relevant to some defense (entrapment, for example) when they have made no showing to the court, by proffer or otherwise, that the evidence will be relevant to any issue to be submitted to the jury.

Defendants have argued, quite explicitly, that they have a right to have the jury hear evidence they claim to be admissible on a theory of entrapment, without any showing from which the court can determine that entrapment is an issue properly to be submitted to the jury, and that the government has only a right to have the court instruct the jury to disregard the evidence if defendants do not make good their representation that they will, before the trial is over, offer evidence sufficient to take the issue of entrapment to the jury. This argument must be rejected. If it were sustained, a court would be without power to limit the evidence heard by the jury to evidence relevant to the issues submitted to the jury. Courts would then lack control essential to both the fairness of trials and to reasonable limitations of length.

The court will not *require* a proffer by defendants. The court will, however, make its determinations regarding claimed *Brady* violations on the basis of the submissions before the court. If defendants wish not to disclose evidence of which neither the government nor the court is aware, they are free to take that course. If that undisclosed evidence is sufficient (when taken together with other evidence that is known or should be known to the government) to trigger a *Brady* obligation, the obligation will arise only when the disclosure is made, not before.

### 2. Evidence Related to Obstruction-of-Justice State of Mind

Defendants argue that, in violation of *Brady* obligations, the government failed to disclose evidence favorable to the de-

fendants on the issue of the nature of the defendants' notebooks. Specifically, defendants argue that the position of the government on the notebooks has been that notebook entries are evidence that the person who made the entry had the state of mind of desiring to bring about whatever events the entry reflects. In contrast, defendants' position has been that they were mere stenographers who would invariably write down everything a source might tell them regardless of its content and regardless of their state of mind. In light of these contrasting positions, defendants argue that the definition of "exculpatory" evidence under *Brady* extends to information that "QED," whom the government concedes is Emerson and who is a frequently cited source in the notebooks, is an individual with a long history as a criminal informant for the government. This argument does not withstand close examination.

It is worth noting, first, that the defendants' characterization of the government's position with respect to the significance of the notebooks is not accurate. The government's primary argument has been that the notebook entries show that the defendants were aware of the Boston situation and cultivated sources with information on Boston. Further, the notebook entries were used, the government argues, for later discussions among defendants about the Boston situation and to brief Lyndon LaRouche. The defendants' erroneous overstatement of the government's position is not determinative, however, because after the overstatement is disregarded there remains a distinct difference between the government's view of the notebooks and that of the defendants.

▋ The principal reason for rejecting defendant's argument with respect to the *Brady* character of information about Emerson as it relates to differing interpretations of the notebooks is that nothing revealed about Emerson at the hearing has any rational tendency to support one of these interpretations over the other. Emerson's contacts with the government, whatever their scope may have been, do not speak to the issue of the character of defendants' notebooks. There is no logical chain of argument that begins "Emerson had extensive contact with the FBI" and ends "thus you should conclude that the defendants merely recorded whatever a source told them and did not use their notebooks for later discussions or to brief Mr. LaRouche." Therefore, the Emerson information is not exculpatory on this theory, and no *Brady* obligation attached on this ground.

Defendants make a second state-of-mind argument under *Brady*. Defendants have made well known that one of their major theories of defense is lack of corrupt intent as defined by the substantive criminal law of obstruction of justice. Specifically, defendants have argued that certain acts allegedly undertaken in violation of the obstruction-of-justice laws were done not with the intent to obstruct the grand jury but solely with the intent to thwart perceived FBI harassment. The court already has made an *in limine* ruling that this is a valid defense, if supported by evidence. *See* Memorandum and Order of April 8, 1988, pp. 23–24. That same Memorandum noted, however, that not all evidence of "FBI harrassment" is relevant to state of mind (and, on this ground, exculpatory). *Id.*

Evidence tending to show that the FBI in fact infiltrated or otherwise "harassed" entities associated with Mr. LaRouche but were never detected by NCLC members is not exculpatory (on this state-of-mind theory) because it does not tend to make less likely a reasoned inference that any alleged act of obstruction of justice or overt act in furtherance of the conspiracy was undertaken with an obstruction-of-justice state of mind. *Cf. United States v. Burks,* 470 F.2d 432, 434–35 & n. 5 (D.C.Cir.1972) (holding that extrinsic proof of specific acts of violence is admissible where a claim of self-defense is raised and where there is evidence that defendant *knew* of the deceased's character). Defendants have not argued that they were aware, at the time any alleged acts of obstruction or overt acts occurred, that Emerson was connected with the FBI. Indeed, they have argued the contrary. Because information about

Emerson of which they were unaware could not have affected their state of mind, defendants argument (on this theory) that undisclosed information of Emerson's FBI connections is exculpatory and *Brady* material must be rejected.

### 3. Evidence Related to Entrapment Theories

Another of the primary strategies defendants have declared they intend to pursue in this case is an entrapment defense. The backbone of this argument is that Forrest Lee Fick and Roy Frankhauser were government agents who suggested the very conduct the prosecution relies upon to make its case and, further, "fed" incriminating entries into the defendants' notebooks. Under this defense theory, Fick and Frankhauser were government agents during the life of the alleged conspiracy. Defendants contend that it is exculpatory that Emerson, another government "plant," made "similar suggestions" to those made by Fick and Frankhauser.

On the record before me, defendants' contention, as stated, suffers from serious gaps in factual support. As factfinder, with respect to issues presented by the Emerson Hearing, I have found that Emerson did not make any suggestions to defendants that "closely parallel" (as defendants' phrase their contention) the statements of Fick and Frankhauser relied on by the government. In fact, I have found *no* entries attributed in the defendants' notebooks to Emerson that contain an invitation to criminal wrongdoing. *See* Findings of Fact, paras. 20, 36. A narrower contention remains to be addressed, however.

Defendants contend that even if Emerson's suggestions are not similar to those of Fick and Frankhauser, evidence of Emerson's association with the FBI is nevertheless exculpatory because Emerson, like Fick and Frankhauser, was an intelligence source of the Security Staff and the fact that he was recruited by the FBI reinforces the inference that Fick and Frankhauser were also. Some of the elements of this narrower contention are supported by

the facts. As noted in Part I.A.1. above, however, support for some but not all of the elements essential to presenting an issue for the jury is not enough to trigger a *Brady* obligation. *See supra* pp. 1296–97.

■ A *Brady* obligation to disclose evidence arises only where that evidence "might have affected the outcome of the trial." At a minimum, it is clear that evidence supportive of a theory on which there is insufficient evidence to create a jury issue cannot be material. Such evidence could never affect the outcome of the trial (unless the jury disregarded the court's instructions). Therefore, the court cannot determine that a *Brady* obligation attaches on an entrapment theory unless it finds (1) there is enough evidence within the government's possession to create a jury issue on entrapment, or (2) the evidence in the government's possession in combination with evidence the defendants have called to the attention of the court is enough to support a court ruling that the evidence supports an instruction to the jury on entrapment.

■ "[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States,* —— U.S. ——, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). The trial court will not instruct on entrapment and make it a jury issue unless the evidence presented is sufficient to support both elements of the entrapment defense. *United States v. Busby,* 780 F.2d 804, 806 (9th Cir.1986); *United States v. Murphy,* 852 F.2d 1, 4–6 (1st Cir.1988). In the case at bar, the only evidence of entrapment before the court at this stage, involving Emerson in any way, is the evidence that Emerson was an intelligence source of the defendants' Security Staff and was recruited by the FBI. Viewed most favorably to defendants, this evidence is insufficient to support the chain of argument that Fick and Frankhauser were government agents during the life of the conspiracy. Without more, this evidence is too attenuated for a reasoned in-

ference that defendants were induced by government agents to commit the crimes with which they are charged. Nor have defendants called to the court's attention other evidence that would, when considered together with this evidence about Emerson, be sufficient to support the reasoned chain of inference essential to this entrapment theory.

A second reason the court cannot determine that the evidence at the Emerson Hearing is exculpatory in relation to an entrapment theory is that defendants have not called to the court's attention evidence supporting the second required element of entrapment—lack of predisposition.

■■■ For these reasons, I conclude that, because the information the government failed to disclose (in combination with other information the government possesses or in combination with other information called to the court's attention by defendants) would not create a jury issue on entrapment, the court cannot determine that the information is material within the meaning of *Brady* and cannot determine that a duty to disclose it was violated. *Cf. United States v. Giry*, 818 F.2d 120, 130–31 (1st Cir.) (holding that no duty to disclose the name and address of an informant arose because the informant's testimony could not reasonably have provided evidence on lack of predisposition without which there would be no jury issue on entrapment), *cert. denied*, — U.S. —, 108 S.Ct. 162, 98 L.Ed.2d 116 (1987); *United States v. Imbruglia*, 617 F.2d 1, 6 (1st Cir.1980) (noting that "[t]hough this [undisclosed] evidence may possibly indicate solicitation, solicitation alone is not entrapment").

■■■ Defendants have argued, in addition to their contentions about the similarity between the government's recruitment of Emerson and the alleged recruitment of Fick and Frankhauser, that the government's reference in its opening to a notebook entry attributed to Emerson makes exculpatory the evidence that Emerson made the "successful blocking" statement at a time after he had been asked by Special Agent Klund to re-establish contact with the defendants. Defendants contend

that this evidence is exculpatory because it supports an argument (though exactly how or in what way it can be said to support the argument has not been made explicit) that the government entrapped the defendants by "feeding" statements into their notebooks and relying on those statements as overt acts of the conspiracy. For substantially the reasons stated above, I conclude that the evidence that Klund had asked Emerson to re-establish contact with the defendants is not *Brady* information because other evidence essential to making it material has not been called to the court's attention. The unexplained assertion that evidence supports an argument, without any reasoned explanation of how it does so, leaves a gap in the chain of reasoned explanation. Thus, this is another instance in which defendants argue that evidence of a single link in a chain of reasoning is exculpatory, without calling attention to evidence supporting other links, the absence of which makes this evidence immaterial.

### 4. Other Brady Theories

Defendants make two further contentions with respect to other evidence they argue the government was obligated to disclose pursuant to *Brady*.

#### (a) *The "Cover Story"*

■■■ The defendants argue that the failure to disclose until well into the Emerson Hearing AUSA John Markham's personal role in conceiving the Emerson "cover story" was a "blatant violation of *Brady*." Although I find that Markham knowingly failed to disclose his role until late in the hearing, I conclude that the government had no reason to believe, at any earlier time, that his personal involvement in the cover story was exculpatory and, as a result, the government was not obligated to disclose it under *Brady*. Even now, defendants have articulated no theory in relation to issues presented by this case, and the court is not aware of any, under which Markham's personal role in the cover story is material to any issue to be submitted to the jury. Moreover, long before Markham's role was disclosed, the government

disclosed that Klund, without question a government agent, told Emerson what to say when he met defendants in late September 1986. Thus, even if the fact that Emerson was provided a cover story by a government agent may become relevant to some issue before the jury at trial—whether entrapment, state of mind, or any other defense—I conclude that I cannot determine that the government should have determined, at a time before Markham's involvement was disclosed, that the fact of his involvement was exculpatory.

### (b) *The Franks Argument*

■ Defendants argue that the government's failure to disclose information that would have provided evidence for relief under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), was a violation of *Brady*. Under *Franks*, defendants are entitled to an evidentiary hearing as a prelude to a motion to suppress if (1) they make a substantial preliminary showing that a false statement was made, with knowledge of its falsity or with reckless disregard for its truth or falsity, in connection with a warrant affidavit and (2) the false statement is necessary to a finding of probable cause. *Id.* at 155–56, 98 S.Ct. at 2676. Defendants are required to support their allegations with specific offers of proof. *Id.* at 171–72, 98 S.Ct. at 2684.

### (1) The Evidence Not Disclosed

■ The evidence not disclosed in this case that defendants rely upon is evidence that (1) contrary to the literal statement in paragraph 4 of the affidavit, Special Agent Richard Egan did not personally speak with Emerson (John Doe No. 15) but relied on Klund's representations as to Emerson's reliability and the information he provided with respect to the location of the security offices, (2) John Doe No. 15 was never invited into the office by Michelle Steinberg, and (3) no map with the particularity detailed in the affidavit was ever described to Egan or (perhaps) ever existed. Findings of Fact, paras. 71–75. If available to defendants, this evidence would have provided them with substantial evidence that

one or more false statements were made in connection with the warrant affidavit. Nevertheless, even if a finding of reckless disregard could be made (a finding I do not make on the record before me), a *Franks* hearing would not have been appropriate (and is not appropriate on the evidence now known), because the false statements with respect to John Doe No. 15 are not necessary to the finding of probable cause and, for that reason, not material under *Franks*.

### (2) The Issue Defined

As a preface to explaining the basis for my conclusion that the false statements are not necessary to the finding of probable cause, it is useful to identify precisely the issue to which Egan's representations with respect to Emerson relate. Wholly without reference to information attributed to John Doe No. 15, probable cause was established to believe that the notebooks contained evidence of crime. *See* Affidavit in Support of Search Warrant, para. 42. Also, probable cause to believe that the notebooks would be found within the security offices was established without reference to John Doe No. 15. *See id.* at para. 44. The only issue affected by Egan's representations with respect to Emerson is the location of the security offices.

Location of the items to be seized is, of course, an important element of the warrant requirement. The Fourth Amendment provides that no warrants shall issue except those "particularly describing the place to be searched." Nevertheless, the level of particularity required is not as high as the level assumed in defendants' argument. Contrary to defendants' premise, *see* Defendants' First Motion and Memorandum to Suppress Re: Material Misrepresentation of Facts in the Affidavit (Docket No. 1613), p. 14, it is not necessary that Egan's affidavit provide probable cause for determining that the security offices were located within the suite of offices (controlled by defendants) at the "rear section of the first floor right." *See, e.g., United States v. Miller*, 753 F.2d 1475, 1481 (9th Cir.1985) (upholding a warrant authorizing a search for a laboratory in any structure

on defendants' 41 acre ranch); *United States v. Whitten*, 706 F.2d 1000, 1008 (9th Cir.1983) (upholding a warrant authorizing a search for a laboratory located in either of two buildings at a certain street address), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). The warrant as issued is valid if probable cause existed to conclude that the location of the security offices was in the Travelers Building on the first floor on the east side of the building. While in the area on the east side of the building on the first floor, law enforcement officers would be permitted to search for the security offices and, within the security offices, search for the items described elsewhere in the warrant.

### (3) Lack of Showing of Materiality

I reach the conclusion that the false statements with respect to Emerson in Egan's affidavit are not material within the meaning of *Franks* for two, independent reasons.

#### (i) *Egan's Personal Contact with Emerson Was Not Misrepresented*

I conclude that the information disclosed for the first time at the Emerson Hearing is not sufficient for a substantial showing that the affidavit was false in the sense that it misrepresented the extent of Egan's personal contact with Emerson. *See supra* at p. 1302. The information disclosed at the Emerson Hearing provides substantial evidence of false statements only in relation to the issues of whether Emerson entered the office and whether a map with the detail described in the warrant was effectively made available to Egan. When this material is set to one side, there remains "sufficient content in the warrant to support a finding of probable cause," and, therefore, no *Franks* hearing is required. *Franks*, 438 U.S. at 172, 98 S.Ct. at 2685.

Defendants argue that Egan's statement in paragraph 4 of the affidavit, in which he states his belief that all twenty-nine John Does are reliable and that the information stated by them *to him* is reliable, was a representation that all of the information attributed to any John Doe was communicated to Egan personally. Defendants further argue that an affiant must, when he is relying on other officers, so state in his affidavit in order for the magistrate to make an independent determination of probable cause based on the totality of the circumstances.

It is true that an officer seeking a search warrant is required to state when he is relying on other law enforcement officers for his information and is not relying on his own personal observation. This information may be material to the deliberation of a magistrate deciding what weight to give the evidence. This requirement should not be viewed, however, " 'in a hypertechnical, rather than a commonsense, manner.' " *United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir.1986) (quoting *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965)). "It is sufficient if the affidavit recites at the outset, or if it is clear from reading the affidavit as a whole, that it is based in part upon information obtained from other law enforcement officers." *Id.* When Egan's affidavit is viewed in this common-sense manner, defendants' argument that Egan has misrepresented the extent of his personal contact with confidential informants fails.

At the outset, Egan states in his affidavit that he is an FBI agent assigned to the Boston office and that the investigation of this case has expanded to areas outside his district. Affidavit in Support of Search Warrant, paras. 1, 2. Egan further states that his affidavit results from ongoing investigations by the following law enforcement officials: (1) other FBI agents, (2) U.S. Secret Service Agents, (3) IRS agents, (4) U.S. Postal Service agents, (5) ATF agents, and (6) an assortment of agents associated with the Commonwealth of Virginia. *Id.* at 2. In addition, Egan states:

I make this affidavit based upon matters: (a) I have personally observed, (b) told to me by persons I have interviewed or told to me by law enforcement officials named or referred to in paragraph 2 hereof whose personal observations *and interviews with others* form the basis of what they have told me, and (c) learned by me in my review of written material

and other evidence obtained during the course of this investigation.

*Id.* at para. 3 (emphasis supplied). A common-sense reading of the introductory paragraphs to Egan's affidavit, despite his statement that he believed the matters stated by the John Does *to him* to be reliable, suggests that Egan did not personally speak with every confidential informant referred to in the affidavit.

It is equally clear from a reading of the affidavit as a whole that Egan's affidavit, read in a common-sense manner, does not represent that he has personally gathered all of the information attributed to each confidential informant. There are twenty-six John Does who supply substantive information in the body of the affidavit. (Although Egan names twenty-nine John Does in paragraph 4, three of them are never mentioned again.) Of the twenty-six, Egan expressly states that he spoke only with nine—John Does No. 3, 4, 15, 16, 17, 18, 19, 20, 21. And of these nine, the affidavit reveals only two as to whom the claim is made in more than one paragraph of the affidavit that information was passed directly to Egan (John Does No. 3, 4). In contrast, there are eleven John Does (Nos. 1, 2, 5, 6, 7, 8, 9, 10, 26, 27, 28) as to whom Egan never claims to have spoken directly. Indeed, the affidavit makes clear that there are four John Does (Nos. 11, 25, 29, 30) who spoke only to agents *other* than Egan. A common-sense reading of the affidavit as a whole suggests that Egan received information directly from an informant only on those relatively infrequent occasions when he states that he did. Where Egan states simply that a John Doe "provided information," the most reasonable inference is that the information was provided to another law enforcement officer in connection with the investigation. (This conclusion is not materially undercut by Egan's statement (apparently false) in paragraph 33(c), forty pages before the alleged misrepresentations at issue, that John Doe No. 15 "told me" that the phone team was located in certain rooms in the Travelers Building.)

Because a common-sense reading of the affidavit as a whole does not suggest that Egan misrepresented to the magistrate his personal contacts with Emerson, Egan's statements that Emerson was told by Jeffrey Steinberg that the security offices had moved to the Travelers Building and that Emerson had visited with Michelle Steinberg after knocking on a door on the right of the main corridor on the first floor of that building are not misrepresentations within the scope of *Franks* because Egan "believed or appropriately accepted them as true." *Kirk*, 781 F.2d at 1505.

If a magistrate set to one side those substantive statements called into question by evidence developed at the Emerson Hearing (such as whether Emerson was invited *into* the offices and whether a map of the particularity of that described in the affidavit existed), there would remain "sufficient content in the warrant to support a finding of probable cause." *Franks*, 438 U.S. at 172, 98 S.Ct. at 2685. The content that would remain in Egan's affidavit would be as follows: (1) John Doe No. 15 reported that defendant Jeffrey Steinberg had told him (Emerson) that the security offices had relocated to the Travelers Building, (2) John Doe No. 15 visited with Michelle Steinberg, outside the offices, after she appeared at the third door on the right off of the main corridor on the first floor of the Travelers Building, (3) John Doe No. 27 saw construction personnel on the first floor of the Travelers Building at about the time the security staff moved into the building, and (4) John Doe No. 27 worked in the Travelers Building and indicated that the security staff was located on the first floor behind the second door on the right side of the main hallway.

Reliability of the information on location of the security offices (to be distinguished from the reliability of Emerson personally and generally) is established by the fact that the information provided by Emerson is "corroborated in substantial respects," Affidavit in Support of Search Warrant, p. 3, by John Doe No. 27. *Cf. United States v. Ellison*, 793 F.2d 942, 946 (8th Cir.) (holding that informants' reliability could be confirmed by "noting the consistency of their statements, particularly since they were interviewed separately on different

dates"), *cert. denied,* 479 U.S. 937, 107 S.Ct. 415, 93 L.Ed.2d 366 (1986). John Doe No. 27 independently confirmed that the location of the security offices had been moved to the east side of the first floor of the Travelers Building. The affidavit states that John Doe No. 27 works in the Travelers Building, and this fact can be inferred from the information John Doe No. 27 provided about the location of various persons and offices throughout the building. *See* Affidavit in Support of Search Warrant, paras. 26, 53 (at pp. 74, 76, 78, 81).

The information provided by John Doe No. 15 (purged of falsities) and John Doe No. 27 provides probable cause for the conclusion that the security offices were located on the east side of the first floor of the Travelers Building—that is, probable cause for the warrant as issued.

(ii) *Immateriality of Misrepresentations of Extent of Egan's Personal Contact*

Even if it is assumed that the information disclosed for the first time at the Emerson Hearing *does* constitute substantial evidence of a misrepresentation with respect to Egan's personal contact with Emerson, the false statements would nevertheless fail to meet the materiality requirement imposed by *Franks* as interpreted by the First Circuit. When statements in an affidavit are tainted by omissions, the district court is not directed to disregard those statements entirely; rather, it is appropriate to reconsider the affidavit disregarding the falsities and supplemented by the omitted information. Following this course, the court must determine whether the warrant would " 'necessarily, nevertheless, have issued.' " *United States v. Cole,* 807 F.2d 262, 268 (1st Cir.1986) (quoting Young, D.J.), *cert. denied,* —— U.S. ——, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987). I conclude that this question must be answered affirmatively in the present case. Therefore, defendants are entitled to no relief under *Franks.*

In *United States v. Cole,* the First Circuit was presented with a *Franks* hearing for review and noted that "the [district]

court's findings on materiality deserve quoting." *Id.* at 267.

"Materiality means if the [omitted] statements had been made and what we know today after two days of hearing, had been in the affidavit, would the warrant necessarily, nevertheless, have issued. If it would have issued even though we knew these things, the information is immaterial."

807 F.2d at 268 (quoting Young, D.J.). The court concluded that "the district court properly applied the test required under *Franks v. Delaware." Id.; see also United States v. Silvestri,* 787 F.2d 736, 746 (1st Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988); *United States v. Levasseur,* Criminal No. 86–180–Y, slip op. at 26–28 (D.Mass. April 8, 1988) (Young, D.J.).

After supplementation by the omitted information with respect to Egan's lack of personal contact with Emerson and excision of the substantive statements called into question by evidence developed at the Emerson Hearing, Egan's affidavit would state: (1) Egan believed the matters stated by John Doe No. 15 (Emerson) to another law enforcement official to be reliable; (2) John Doe No. 15 reported to another law enforcement official that defendant Jeffrey Steinberg had told John Doe No. 15 that the security offices had relocated to the Travelers Building, (3) John Doe No. 15 reported to another law enforcement official that he had visited with Michelle Steinberg, outside the offices, after she appeared at the third door on the right off of the main corridor on the first floor of the Travelers Building, (4) John Doe No. 27 saw construction personnel on the first floor of the Travelers Building at about the time the security staff moved into the building, and (5) John Doe No. 27 worked in the Travelers Building and indicated that the security staff was located behind the second door on the right side of the main hallway. I conclude that had the Egan affidavit submitted to the magistrate been in this form, the warrant, in the words quoted above from *Cole,* would "necessarily, nevertheless, have issued."

The reliability of the information on the location of the security offices is established by the fact that each informant's information is independently corroborated. *See supra* pp. 1304–05. The layer of hearsay between Emerson and Egan added by explicit supplementation of pages 77–78 does not substantially detract from the reliability of the information because there is no evidence on the record that Emerson did not actually provide the information described above and because the information was communicated to Egan by another law enforcement officer. *Cf. United States v. Ventresca,* 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965) (stating that "[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number").

The information provided by John Doe No. 15 (supplemented by omitted information and purged of falsities) and John Doe No. 27 provides probable cause for the conclusion that the security offices were located on the east side of the first floor of the Travelers Building—that is, probable cause for the warrant as issued.

For both of the reasons stated above, the evidence not disclosed by the government was insufficient to provide for relief under *Franks.* Therefore, the information not disclosed could not have affected the outcome of the trial and, as a result, was not material evidence within the meaning of *Brady.*

### B. *Rule 16 Obligations*

Defendants assert as an argument distinct from those made under *Brady* that the government failed to disclose evidence it was obligated to disclose under Rule 16 of the Federal Rules of Criminal Procedure. Rule 16(a)(1)(C) provides:

> Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to

the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

The scope of Rule 16 is not identical to the scope of the *Brady* obligation. Rule 16 requires the government, for example, to disclose upon request of the defendant documents intended for use by the government as evidence in chief at trial or documents obtained from the defendant, and it imposes these obligations without reference to the documents' exculpatory nature or materiality. Defendants have not argued, however, that the government failed to disclose any documents intended for use in its case in chief or documents obtained from defendants. Instead, defendants rely on that portion of Rule 16(a)(1)(C) that provides for discovery of documents "which are material to the preparation of the defendant's defense."

██ Materiality for purposes of Rule 16 essentially tracks the *Brady* materiality rule. This conclusion is supported by the Advisory Committee Notes to the 1974 Amendments. *Proposed Amendments to Federal Rules of Criminal Procedure,* 62 F.R.D. 271, 311 (1974). Because I have concluded in Part I.A. that there were no violations of *Brady* exclusive of Emerson's status as a proposed government witness, it follows that there were no violations of Rule 16.

Defendants argue that the scope of materiality under Rule 16 is somewhat broader than that under *Brady.* In support, they cite *United States v. Felt,* 491 F.Supp. 179 (D.D.C.1979). The *Felt* court stated:

> Although Rule 16(a)(1)(C) has at times been interpreted to track closely with the constitutional standard [of *Brady* ], this court believes that documents are "material in the preparation of the defense" if there is a strong indication that they will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal.

*Id.* at 186 (citations omitted). I conclude that it is unnecessary for me to decide

whether or not to follow *Felt* because defendants have not identified any material non-disclosures within even the slightly expanded definition of materiality articulated in *Felt*.

### C. *Roviaro Obligations*

In their final submission regarding Emerson (Docket No. 1594), defendants have not made a separate argument that the government violated its obligations of disclosure under *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Because defendants did advance this argument in their original submissions requesting an evidentiary hearing, however, and because my original discussion of the issue in the Memorandum and Order of April 8, 1988 is not as precise as it could have been, I address the *Roviaro* issue briefly here.

*Roviaro* held: "Where the disclosure of an informant's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cuase, the [informant's] privilege must give way." 353 U.S. at 60–61, 77 S.Ct. at 627–28. Although originally framed as a rule of federal evidentiary law, subsequent Supreme Court decisions have made clear that *Roviaro*'s holding is based on both due process and confrontation clause claims. *See United States v. Valenzuela–Bernal*, 458 U.S. 858, 870, 102 S.Ct. 3440, 3448, 73 L.Ed.2d 1193 (1982). *Roviaro*'s progeny supports the proposition that *Roviaro* imposes an affirmative disclosure obligation on the government rather than simply dictating the manner in which disputes over invocation of the informant's privilege will be resolved. The question remains what disclosure obligation it imposes.

■ I conclude that *Roviaro* cannot be understood in isolation. Each defendant is guaranteed the right to a fair trial, which right necessitates fair trial procedures, an impartial judge and factfinder, a competent attorney, and the opportunity to present a defense. It would be fundamentally unfair for the government to withhold information from the defendant that denies the defendant an opportunity to mount his defense. For this reason, *Brady* imposes an obligation on the government to disclose to the defendant evidence that is exculpatory and material. *Roviaro* must impose a different obligation if it is to have independent force. I conclude that the *Roviaro* obligation is not that the government turn over exculpatory evidence (an obligation already defined by *Brady*) but that the government provide a defendant with information about the identity of an informant, which may be the *means to obtain* further exculpatory evidence from that person. Thus, as I stated in the Memorandum and Order of April 8, 1988, "[d]ue process, as defined in *Roviaro*, demands only that defendants not be denied the ability to prepare a defense by the government's [failure] to make available information necessary to make contact with a material witness." *Id.* at 32. Defendants were not denied that ability in this case.

■ Defendants possessed all the information they needed to obtain information from Emerson before the trial began. They knew Emerson's name and address. They not only had an opportunity to interview Emerson, they did interview him several times. Findings of Fact, para. 1. Emerson was available to testify at defendants' trial if they cared to call him. No decision called to the court's attention has found a *Roviaro* violation in these circumstances. For this reason, I conclude that the government did not violate any disclosure obligations imposed by *Roviaro*.

### D. *Obligations Imposed by Court Order*

■ Defendants assert that the government failed to comply with the obligations imposed by a September 15, 1987 Order of Magistrate Collings relative to the Supplementary Motion of Defendant LaRouche for Discovery and Disclosure and Exculpatory Evidence (Motion No. 325). This motion asked the government to produce several categories of information with respect to Emerson. This information was not disclosed until much later. The Magistrate's order, however, directed only that the

government treat the motion as a request for exculpatory evidence under *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), Fed.R.Crim.P. 16, and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). This order was no more than an order to the government to comply promptly with its disclosure obligations in relation to the motion in question. Parts I.A., I.B., and I.C. conclude that the government complied with all of its *Brady* (and *Agurs* ), Rule 16, and *Roviaro* obligations with respect to Emerson exclusive of his status as a witness. For this reason, the government did not violate the September 15, 1987 Order of Magistrate Collings, except to the extent described in Part II.A.

## II. DISCLOSURE DUTIES STEMMING FROM EMERSON'S STATUS AS A GOVERNMENT WITNESS

Defendants argue, in addition to their arguments with respect to the government's disclosure obligations exclusive of Emerson's status as a proposed government witness, that Emerson's status as a government witness triggered further disclosure obligations and crystallized others. Specifically, defendants argue that Emerson's status as a witness triggered disclosure obligations under *Brady*, agreements of counsel, and the Jencks Act.

### A. *Brady Obligations*

 The government essentially has admitted that it violated its *Brady* obligations when account is taken of Emerson's status as a proposed government witness. Impeachment evidence is *Brady* material. *See Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972); *United States v. Ingraldi*, 793 F.2d 408, 411 (1st Cir.1986). The following evidence would have been useful for impeachment of Emerson, and, as a result, it is *Brady* material:

(1) Evidence that Emerson had worked for the government, including information that he had been paid for his services in the past and was seeking payment in connection with this case, Findings of Fact, paras. 2–6, 9, 14, 44, 61;

(2) evidence that Emerson had deliberately deceived defendants with respect to his intelligence information and sources, Findings of Fact, para. 16; and,

(3) evidence that various government agents considered Emerson to be untrustworthy, Findings of Fact, paras. 24, 84.

This evidence could not be determined to be exculpatory, and no duty to disclose it arose, until the government decided to include Emerson on its witness list. The meaning of "exculpatory" for any particular claim of a *Brady* violation must be determined in relation to an identifiable issue in the case. *See supra* Part I.A. 1.(a)(2). The evidence identified above is exculpatory only in relation to impeachment of Emerson. Therefore, the *Brady* obligation did not arise until the government knew, or reasonably should have known, that Emerson was to be a witness. I have found that this decision was made between December 9 and December 15, 1987. Findings of Fact, para. 113. The government should have disclosed the evidence summarized above as soon as practicable after that time.

### B. *Agreements of Counsel*

[25] Counsel in this case have executed a number of agreements with respect to discovery matters. Defendants argue that the government violated its obligations with respect to a number of these agreements. Although some obligations pursuant to the agreements that defendants cite are dependent on conclusions concerning the scope of *Brady* that I have rejected in Part I.A., the government failed to comply with its discovery agreements in several respects.

On February 26, 1987, AUSA Markham met with attorneys Moffitt and Alcorn to discuss unresolved discovery requests. The agreements reached were reduced to writing in a letter of March 3, 1987. Findings of Fact, para. 86. Among the matters resolved was Request No. 48 of defendants' Motion for Exculpatory Evidence, which asked for copies of all correspondence between Emerson and Special Agent Klund. The government agreed to provide

such information to the extent it was exculpatory. Also resolved as to witnesses and *Brady* material was request number 11 of the Joint Motion of All Accused for Disclosure of Confidential Informants, which asked for the nature of the relationship between Emerson and any federal agency. Findings of Fact, para. 92. These agreements obligated the government to turn over substantially all of the impeachment *Brady* material described in Part II.A. These obligations arose at the same time as the obligations under *Brady*—when the government decided that it intended to call Emerson as a witness at trial.

A subsequent letter dated November 24, 1987 memorializing agreements reached between AUSA Markham and attorney Shapiro indicates that the government had agreed to provide polygraphs for all witnesess. Findings of Fact, para. 113. This agreement obligated the government to disclose Emerson's polygraph (Exhibit NNNN) as soon as Emerson was placed on the government's witness list, even though the exam indicated that Emerson was telling the truth and, therefore, was not exculpatory.

### C. *Jencks Statements*

■ The Jencks Act, 18 U.S.C. § 3500, requires the government to produce on motion of the defendants all statements of a government witness that relate to the subject matter of the witness's testimony. (Emerson was designated a government witness no later than December 15.) The Act defines statement as (1) a written statement signed or otherwise approved by the witness, (2) a substantially verbatim recital of an oral statement by a witness, or (3) any statement made by the witness to a grand jury. § 3500(e). Although Jencks material normally need not be turned over until after the witness has testified on direct examination, § 3500(a), the government agreed in this case to provide Jencks material no later than December 16, 1987. Stipulation Regarding Certain Matters Relating to Trial (Docket No. 1203), at p. 5.

■ Pursuant to the Jencks Act and the stipulation of counsel, the government was obligated to disclose to defendants by December 16, 1987, the following:

(1) The "Foxchase" report (Exhibit KKKK)—a memo written and adopted by Emerson that clearly relates to his (anticipated) testimony; and,

(2) the audio tape of Mr. Siebert's interview of Emerson (Exhibit QQ, pp. 132–41)—a substantially verbatim recital of Emerson's oral statements related to his (anticipated) testimony.

The government violated these obligations. Neither the Foxchase report nor the Siebert interview was disclosed before a time during the Emerson Hearing.

■ Contrary to the contentions of defendants, the government was not obligated by the Jencks Act to disclose the 302s, Inserts, and interview notes of agents Llewellyn and Klund. An agent's interview notes and 302s are not "statements" of the interviewee within the meaning of the Jencks Act unless the witness signed or otherwise approved the notes or the notes were a substantially verbatim report of the interview. *United States v. Welch*, 810 F.2d 485, 490 (5th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987); *United States v. Michaels*, 796 F.2d 1112, 1116–17 (9th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987); *United States v. O'Malley*, 796 F.2d 891, 900 (7th Cir.1986). I conclude upon examination of the 302s, Inserts, and notes (Exhibits MM, PPPP) that none of them qualifies as a statement of Emerson within the meaning of the Jencks Act; therefore, the government was not obligated to disclose them pursuant to the stipulation (Docket No. 1203).

■ I also reject the defendants' contention that Emerson's Gondole Supper Club Memorandum (Exhibit MMMM) is covered by Jencks. Although the memorandum qualifies as a statement, it does not relate to the subject matter of Emerson's anticipated testimony on direct examination. No persons or entities associated with Mr. LaRouche are mentioned in the communication. Thus, the Jencks Act does not obligate disclosure. *See* § 3500(b).

Finally, in the Stipulation Regarding Certain Matters Relating to Trial (Docket No. 1203), the government agreed to provide "a list of all items not considered by the government to be *Jencks* material but which the defendants may contend to be *Jencks* material, such as interviewers' notes of interviews of witnesses [and] interviewers' 302's or reports of interviews of witnesses...." Defendants were entitled to receive this list as of December 16.

## III. SUMMARY OF GOVERNMENT VIOLATIONS AND EXTENT OF DELAYED DISCLOSURES

Before the issues of prejudice and remedy are addressed, it is appropriate to make clear exactly what violations of government disclosure obligations occurred, which evidence was disclosed later than it should have been, when the delayed evidence should have been disclosed, and when the evidence was actually disclosed, and the nature of the government violations. This Part addresses these points.

### A. *Disclosure Obligations Violated*

Part I concluded that the government had not violated any disclosure obligation with respect to Emerson exclusive of his status as a witness. Part II concluded, however, that obligations imposed by several sources were violated with respect to Emerson in view of his witness status.

The disclosure obligations violated were as follows:

(1) Failure to make timely disclosure of impeachment evidence required to be disclosed under *Brady, see* Part II.A.;

(2) failure to comply with discovery agreements reached among counsel, *see* Part II.B.; and

(3) failure to produce several statements of Emerson required to be disclosed before trial by the Jencks Act in combination with the Stipulation of Counsel, *see* Part II.C.

It is worth noting at this point that I have not found the government guilty of wholesale violations of *Brady*, Jencks, or discovery agreements. Large quantities of evidence were produced, at great effort, by the government. Defendants, however, were entitled to more.

### B. *Evidence Disclosed Late*

The government was late in disclosing the following evidence:

(1) The substance of Emerson's connections with federal agencies, *see supra* p. 1308;

(2) evidence that Emerson had been paid for his services as an informant in the past and had requested payment in this case, *see supra* p. 1308;

(3) evidence that Emerson had deliberately deceived defendants by fabricating intelligence information and sources, *see supra* p. 1308;

(4) evidence that some government agents considered Emerson to be untrustworthy, *see supra* p. 1308;

(5) Emerson's polygraph, *see supra* p. 1309;

(6) the "Foxchase" report, *see supra* p. 1309; and

(7) the audio tape of Siebert's interview with Emerson, *see supra* p. 1309.

### C. *Extent of Delay in Disclosure*

Without exception, all of the government's disclosure obligations stem from Emerson's witness status. I have found that the prosecution decided to name Emerson as a witness between December 9 and December 15, 1987. The Stipulation of Counsel that provided for accelerated disclosure of Jencks material called for disclosure by December 16, 1987. Therefore, all of the evidence identified above in Part III.B. should have been disclosed by December 15–16, 1987.

Klund's 302s related to Emerson were delivered to defense counsel on March 22, 1988. The 302s establish that Emerson had *some* contacts with the FBI and that he had deliberately deceived defendants with respect to his intelligence information. Because further FBI documents were disclosed to defense counsel almost daily after March 22, it is not clear exactly when the government disclosed the bulk of materials establishing Emerson's connections with federal law enforcement. It is clear that the government had disclosed the sub-

stance of Emerson's connections and the fact that he had been paid for his services by April 14, 1988. *See* Second Amended Proposed Admission of Relevant Facts that Classified Documents Would Tend to Prove (Docket No. 1435).

The evidence that Llewellyn, Klund, and Moore considered Emerson to be unstable and untrustworthy was disclosed on March 28–29, 1988 at various points during the Emerson Hearing during testimony of the witnesses.

Emerson's polygraph was disclosed to the defendants on March 31, 1988. *See* Findings of Fact, para. 113.

The "Foxchase" report was disclosed on April 29, 1988. *See* Findings of Fact, para. 150.

The audio tape of Siebert's interview with Emerson was disclosed on March 23, 1988. *See* Findings of Fact, para. 133.

### D. *Nature of the Government Violations*

In Parts II and III, I have found government failures to make timely disclosures of information that was in the possession of a government agent and, in some instances, government representations that were inaccurate because inconsistent with information then in the possession of a government agent other than the one making the representation to the defendants or to them and the court. I find that the government has been guilty of negligent misrepresentation in relation to these matters. In reaching this finding of failure to exercise reasonable care to assure the accuracy of representations made and the completeness of disclosures made (in response to recognized disclosure obligations as to a person on the witness list and in fulfillment of agreements with defense counsel), and in finding no intentional violation, I have taken account of the extraordinary burden upon government attorneys assigned to this case, by reason of the massive volume of documentary materials to be examined, the number of persons and entities charged as defendants, the number of defense attorneys making discovery demands upon the government in the representation of their clients, the legal and factual complexities of the charges and of the defenses advanced by defense counsel, and the fact that only two government attorneys have been assigned responsibility for the prosecution of the case and during most periods with each of them having other assigned responsibilities as well as responsibilities to this case. Though material to a determination that the violations were not intentional, these extraordinary burdens do not justify noncompliance and do not serve to rebut an inference of failure to exercise reasonable care. That is, the government's choice to indict and prosecute, and then to commit only limited attorney resources to the case, cannot excuse failure of the government to comply fully with its obligations of due care to comply with disclosure obligations. I find that the government attorneys assigned to this case—AUSA Markham and DOJ Trial Attorney Mark Rasch—have at no time intentionally made any misrepresentation regarding any of the matters that have been the subject of this hearing. Viewing the government's conduct as a whole, however, I find that the government has failed to take due care to assure the accuracy and timeliness of representations and disclosures referred to in the disclosure violations identified in Parts II and III of this Memorandum.

## IV. PREJUDICE TO DEFENDANTS

Defendants acknowledge that the degree of prejudice suffered by them is extremely important in determining which remedies are appropriate. Any remedy allowed must "fit" the prejudice it is designed to address. (Defendants argue, in addition, that other remedies are appropriate as a sanction to deter future government misconduct. Even here, however, the sanction must be tailored to deter the misconduct found.)

### A. *Nondisclosures During Pretrial Detention Hearings*

Defendants argue that they were prejudiced by the government's nondisclosures during pretrial detention hearings insofar as they were deprived of evidence to make their argument on the nature of the

**1312**

notebooks. Part I.A.2., however, rejected defendants' contention that evidence about Emerson was exculpatory as to this issue. As of the time the predetention hearings were held, the government had not violated any disclosure obligations with respect to Emerson. *See* Part III.C. Defendants could not have been prejudiced at their pretrial detention hearings by later violation of an obligation to disclose Emerson materials.

### B. *Nondisclosures During Trial*

■ Defendants argue that their openings, their trial strategy, and their examination of Richard Welsh were adversely affected in a variety of ways by the absence of evidence related to Emerson. I find it unnecessary to address these arguments on the merits. Assuming the validity of each argument, the only remedy that would "fit" this type of prejudice is a mistrial. For reasons causally unrelated to any government violation of disclosure obligations, however, a mistrial was declared in this case on May 2, 1988. Defendants are free to reform their strategies, before a new trial commences, in light of the late disclosed evidence; therefore, defendants were not prejudiced by the nondisclosure of Emerson evidence during the aborted trial.

### C. *Nondisclosures During Motions to Suppress*

■ Defendants' final argument on prejudice relates to their motions to suppress. The government's failure to disclose evidence of factual inaccuracies in the warrant affidavit related to John Doe No. 15 (Emerson), the defendants argue, denied them the opportunity for a *Franks* hearing. Part I.A.4.(b), above, rejects this argument. Although the evidence not disclosed would have provided defendants with substantial evidence that one or more false statements were made in connection with the warrant affidavit, a *Franks* hearing would not have been appropriate because the false statements were not necessary to the finding of probable cause. Precisely because defendants were not prejudiced by this nondisclosure, I concluded in

Part I.A.4.(b) that it was not "material" within the meaning of *Brady*.

### V. REMEDIES

Defendants have recognized that "a mistrial on other grounds has vitiated many of the harms" that arguably would have stemmed from the government's violation of disclosure obligations. Defendants' Memorandum Re: Emerson (Docket No. 1594), at 55. They argue, however, that various remedies are appropriate as a sanction for government misconduct in order to deter future violations.

There have been several Supreme Court cases in recent years that define, and limit, the discretion of federal courts in the exercise of their supervisory powers. *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), states:

> [I]n the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress. The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct.

*Id.* at 505, 103 S.Ct. at 1978 (citations omitted). In the circumstances presented, the first two of the three purposes underlying use of supervisory powers do not apply. No remedy need be fashioned for violation of rights if defendants were not prejudiced, and no judicial integrity interest is implicated where there has been no conviction. The issue presented in this Part, therefore, is what remedies, if any, are appropriate to "deter illegal conduct" on the part of the government in the circumstances of this case.

■ The discretion of the district court to fashion a remedy/sanction to deter illegal conduct is not without limits. I conclude, for example, that a district court lacks power to order dismissal solely as a sanction to deter illegal conduct. *See Bank of Novia Scotia v. United States,*

—— U.S. ——, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988) (stating that "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant"). In choosing a sanction short of dismissal, I conclude that the district court must choose an available remedy that is "narrowly tailored to deter objectionable prosecutorial conduct." *Hasting,* 461 U.S. at 506, 103 S.Ct. at 1979.

Factors that contribute to the court's decision with respect to sanctions are numerous and varied. The most important factor to consider is whether the government's conduct was deliberate. *Cf. United States v. Hastings,* 847 F.2d 920, 925 (1st Cir.1988). Other important factors are how pervasive the misconduct was and whether it was continuous, *cf. United States v. Broward,* 594 F.2d 345, 351 (2d Cir.), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979), and whether it was serious, *cf. United States v. Capone,* 683 F.2d 582, 586 (1st Cir.1982).

### A. *Deliberateness, Pervasiveness and Severity of Government Misconduct*

The conclusion is inescapable that the government's failure to comply with its disclosure obligations in this case is serious. Although the record does not establish *Brady* violations approaching the scope of those asserted by defendants, the disclosure obligations that were violated were clearly established in the law, not founded on close or debatable legal questions. It is well established that impeachment evidence is *Brady* material, and, at least in this district, it is clear that (identifiable) *Brady* material must be disclosed long before disclosure actually occurred in this case. Total compliance with *Brady,* the Jencks Act, and agreements of counsel are critical prerequisites to the fair administration of criminal justice.

At the same time, I conclude that the government's misconduct was neither pervasive nor deliberate. The discovery demands placed upon the government in this case were enormous. The defendants requested a wide variety of information that, potentially at least, might have been material to a number of defenses. The government was obligated by these many requests to conduct an extensive search of the evidence generated by a lengthy, multidistrict investigation. On the whole, the government complied with its disclosure obligations. It caused government files throughout the country to be searched, and it disclosed huge quantities of *Brady* and Jencks material. *Cf.* Government Exhibit BBBBBB. I find on the record before me that the government's failure to make timely disclosure of Emerson materials was overwhelmingly the exception rather than a pervasive or continuous practice.

Many aspects of the evidence before the court support the finding, which I make, that the government's disclosure violations were not deliberate. First, the prosecutors had very little to gain by deliberately *delaying* disclosure. In a case of *total* nondisclosure, there is a real chance that the government's conduct will not be discovered and, as a result, the government will secure a conviction it might not otherwise have secured. In contrast, in a case of delayed disclosure, no risk remains that the government's conduct will never be discovered, and, under the law, the government would not be permitted to secure any material advantage at trial by its own delay.

Second, the court is convinced by the great weight of evidence that the individual prosecutors appearing before the court in this case take the government's disclosure obligations seriously. This is not a case where the defense made a few simple discovery requests to which the prosecutor failed to respond. To the contrary, defendants made thousands of discovery requests, hundreds of which required the government to conduct wide-ranging searches, and the overwhelming majority of which the government responded to with reasonable promptness.

Finally, I find that the government's late disclosures were not deliberate because the specific circumstances presented support a finding of negligence rather than deliberateness. All of the disclosure obligations violated by the government arose out of Emerson's status as a witness. As of De-

cember 9, 1987, the prosecutors had not finished their list of probable witnesses. At the last minute, they added Emerson to the witness list in order not to be precluded from calling him during trial. Also at this time, the prosecutors were preparing for the start of a large, complex case. Emerson (who, I find, was not considered by the prosecutors to be among the more important witnesses) was not foremost on the minds of the prosecutors, and, simply put, they overlooked the need to search for *Brady* or Jencks Act material until much later.

The government's failure to make prompt disclosure of all Emerson materials *after* disclosures about Emerson emerged as an issue, however, raises a separate issue. From the time the Emerson 302s were first discovered by the prosecutors, they disclosed all evidence that they were obligated to disclose as soon as it came into *their* hands; however, I find that government agents other than the prosecutors appearing before the court in this case were in numerous instances more relaxed in their attitude to *Brady* and Jencks. On more than one occasion aside from the Emerson matter, agencies in possession of necessary files have been slow to provide them, and individual agents have demonstrated that their own view of disclosure obligations is narrower than the view of the prosecutors (and of the law as determined by the court).

Ultimately, of course, the responsibility for fulfilling the government's disclosure obligations rests with the prosecutors. Agents of the federal government outside the Department of Justice are not as fully and professionally trained in the complexities of *Brady* and Jencks. Even if it may be assumed that most federal law enforcement officers are basically familiar with *Brady* and Jencks, only the prosecutors most intimately connected with a given case will be familiar enough with the substantive issues to make the context-specific determinations that *Brady* and, to a lesser degree, the Jencks Act require. In addition, agents not appearing before the court probably do not approach disclosure obligations with the same urgency as officers of the court. For these reasons, the prose-cutors appearing before the court are charged with responsibility for guaranteeing the responsiveness of all federal agents involved. In this case, the prosecutors were limited in their ability to fulfill this responsibility by lack of adequate support and assistance both within and beyond the United States Attorney's office.

The failure of the prosecutors consistently to guarantee the responsiveness of other federal agents was institutional negligence rather than deliberate misconduct. There was no cover-up of evidence extremely damaging to the government's case or delay for tactical advantage; rather, the delayed disclosures are chargeable to a "bureaucratic failure to properly support massive litigation." *United States v. Levasseur*, Criminal No. 86–180–Y, slip op. at 40 (D.Mass. May 4, 1988) (Young, D.J.). It is apparent that two prosecutors cannot comprehensively develop trial strategy, prepare and examine witnesses, respond to substantive defense motions from ten (10) zealous defense attorneys, assemble Jencks material for more than 150 witnesses, and personally oversee all aspects of the *Brady* search.

The appropriate remedy for this transgression, as Judge Young noted, is to pare the trial down to a scope that the government can reasonably support given the resources it sees fit to assign to the case. This is a factor that does not ordinarily have weight in the consideration of motions for severance. I conclude that it must be given weight, however, as I consider motions that have been filed and are now pending with respect to severance of counts and parties before any new trial commences. *Id.* This is a remedy "narrowly tailored" to deter the kind of institutional and systemic prosecutorial misconduct that occurred during the first trial.

For the foregoing reasons, the court will be taking into account the prosecutorial misconduct that occurred in relation to the first trial as it considers defendants' motions for severance now pending, as to which a hearing has been scheduled. None of the other remedies requested by defendants is narrowly tailored to remedy the

violation of disclosure obligations the court has found or is warranted for the deterrence of misconduct. I address each of these requests and explain this conclusion below.

### A. *Dismissal*

 Defendants argue that the "deliberate, repeated and pervasive patterns of governmental misconduct demonstrated here justify dismissal of these indictments." Defendants' Memorandum Re: Emerson (Docket No. 1594), at 51–52. This argument must be rejected for two reasons. First, its premise is not supported by the record. I have found that the prosecutorial misconduct in this case was not deliberate, not repeated in a relevant sense, and not pervasive. Second, under *Bank of Nova Scotia v. United States*, — U.S. —, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988), a federal court may not dismiss an indictment in the absence of prejudice to defendants. Understandably, defendants do not address *Nova Scotia*, which was decided only five (5) days before their submission was filed. I conclude that the cases cited by defendants, to the extent they suggest that dismissal is appropriate in "extreme cases" solely as a sanction, *see, e.g., United States v. Broward*, 594 F.2d 345, 351 (2d Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979), have been overruled.

### B. *Production of Grand Jury Minutes*

 Defendants argue that, "[i]n the wake of the revelations of the Emerson hearings, it is apparent that the integrity of the trial process requires full grand jury disclosure." Defendants' Memorandum Re: Emerson (Docket No. 1594), at 58. Because this remedy in no way "fits" the purposes of the exercise of supervisory powers articulated in *Hasting, see supra* pp. 1312–13, this remedy is not appropriate.

Emerson did not testify before either grand jury in connection with this case. Moreover, nothing disclosed by the proceedings related to Emerson even marginally suggests (1) that defendants were indicted by a grand jury that was not informed, independent, and impartial, *see United States v. Sears, Roebuck & Co.*, 719 F.2d 1386, 1391–92 (9th Cir.1983), *cert. denied*, 465 U.S. 1079, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984), or (2) that defendants have a "particularized need" for grand jury materials, *United States v. Lang*, 644 F.2d 1232, 1238 (7th Cir.), *cert. denied*, 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981).

### C. *Disqualification of AUSA Markham and DOJ Attorney Rasch*

Defendants argue that the prosecutors in this case (Markham and Rasch) should be disqualified from representing the government in the event of a retrial. Defendants assert two bases for this argument. First, defendants argue that they have a Sixth Amendment right to call the prosecutors as witnesses and the "advocate-witness" rule bars the prosecutors from performing a dual role. Second, defendants argue that the prosecutors should be disqualified as a sanction for their misconduct.

 The advocate-witness rule is generally recognized in federal courts and bars an attorney from appearing as both an advocate and a witness in the same litigation. *United States v. Prantil*, 764 F.2d 548, 552–53 (9th Cir.1985); *United States v. Birdman*, 602 F.2d 547, 553 (3d Cir. 1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 and *cert. denied*, 445 U.S. 906, 100 S.Ct. 1084, 63 L.Ed.2d 322 (1980). It does not follow, however, that a prosecuting attorney should be barred from acting as an advocate whenever a defendant expresses an intent to call him or her as a witness. A defendant may call government counsel as a witness only if the testimony sought is "required by a compelling and legitimate need." *United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir.1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976); *see also United States v. Dupuy*, 760 F.2d 1492, 1498 (9th Cir.1985). Defendants have fallen far short of articulating a defense theory pursuant to which they have a compelling need for the testimony of either Markham or Rasch. Indeed, defendants have failed to identify a defense theory for which the testimony in question is relevant.

Defendants' specific argument is that they will seek to establish through Markham's testimony "that the notebook entries were made without any criminal intent" and thereby "undermine the government's proof on the obstruction-of-justice-state-of-mind element." Defendants' Memorandum Re: Emerson (Docket No. 1594), at 62. Defendants fail to identify, however, what testimony they would elicit from Markham or Rasch that would support the inference that the defendants were mere stenographers with respect to notebook entries. Defendants point to the "successful blocking" statement and Markham's personal role in the Emerson cover story. For the reasons stated above in Parts I.A.2., I.A.3., and I.A.4., I conclude that the court cannot determine at this stage of the proceedings that *any* evidence about any of these subjects (from any source) is even exculpatory.

 Defendants have argued in the alternative that Markham and Rasch should be disqualified as a sanction. I conclude that this sanction would be excessive in light of my finding that the prosecutors did not deliberately violate any disclosure obligations.

#### D. *Reconsideration of CIPA Rulings*

 Defendants argue that as a result of the Emerson Hearing they are now in "possession" of classified information sufficient to warrant an adversarial hearing pursuant to section 6 of the Classified Information Procedures Act ("CIPA"), 18 U.S.C.App. §§ 1–16. Two issues must be distinguished before this argument can be addressed. The first issue presented is whether defendants are entitled to a section 6 adversarial hearing as a sanction for government misconduct. This issue is quickly resolved. It would *not* be appropriate to order disclosure of national secrets as a sanction for the wrongdoing of individual government agents.

 The second issue presented is whether information gained by defendants during the Emerson Hearing make a section 6 hearing appropriate on the merits of CIPA. Defendants' proposal for a hearing on this ground fails because defendants have not identified any now-classified information in their possession that they propose to use at trial. Also, they have not identified with any particularity the scope or substance of the hearing they desire. If defendants reasonably expect to cause the disclosure at some future time of information obtained during the Emerson Hearing that they believe is currently classified, they must comply with the requirements of CIPA, including service of a notice of their intent on the government with a brief description of the classified information involved. *See* 18 U.S.C.App. § 5. If the government desires to argue against such disclosure, it will then be free to move for a hearing pursuant to section 6. To the extent that defendants are, instead, seeking *access* to classified information that has not been disclosed to them, a hearing under section 6 is not appropriate under CIPA. Memorandum and Order of April 20, 1988, pp. 2–4.

#### E. *Suppression of the Notebooks*

 Finally, defendants argue that an appropriate sanction for the government's misconduct is suppression of the notebooks. Defendants' Memorandum Re: Emerson, pp. 69–70. Defendants base this argument solely on the value of suppression in deterring government misconduct in the future. I conclude that the remedy of suppression of the notebooks is not one that is "narrowly tailored to deter objectionable prosecutorial conduct." *Hasting*, 461 U.S. at 506, 103 S.Ct. at 1979. This remedy does not "fit" the misconduct because none of the evidence disclosed late bears on the evidentiary value of the notebooks. *Cf.* Part I.A.2. Moreover, the social cost of depriving the government of the notebooks is excessive in light of my findings that the government's misconduct was not intentional or pervasive.

#### ORDER

For the foregoing reasons, it is ORDERED:

Defendants' Request for Findings of Fact Re: Emerson Matter (Docket No.

1595) is allowed to the extent reflected in the court's Findings of Fact of this date.

Defendants' requests for remedies and sanctions, included in Defendants' Memorandum Re: Emerson (Docket No. 1594), are denied.