UNITED STATES of America, Appellee,

v.

**Stephen D. YOUNG,**
**Defendant, Appellant.**

No. 88–1803.

United States Court of Appeals,
First Circuit.

Heard Feb. 8, 1989.

Decided June 21, 1989.

district court judge should have recused himself.

---

**5.** Our opinion makes it unnecessary to comment on or consider plaintiff's claim that the

Albert F. Cullen, Jr., Boston, Mass., for defendant, appellant.

Jeffrey L. Russell, Dept. of Justice, Crim. Div., Narcotics & Dangerous Drug Section, Washington, D.C. with whom Peter E. Papps, Acting U.S. Atty., was on brief, for the U.S.

Before BREYER, ALDRICH and SELYA, Circuit Judges.

BREYER, Circuit Judge.

Stephen Young, appealing from a judgment of conviction for having participated in a continuing criminal enterprise, 21 U.S.C. § 848, and having filed a false income tax return, 26 U.S.C. § 7206, asks us to decide the lawfulness of the search that produced the evidence against him. *See* Fed.R.Crim.P. 11(a)(2) (permitting plea of guilty "conditional" on appellate review of adverse decisions of pretrial motions). The district court partly granted and partly denied Young's motion to suppress evidence that law enforcement officers seized during a search of his home in mid-January 1984. The district court agreed with one of Young's "search and seizure" claims, namely that certain aspects of the search unlawfully exceeded the scope of the search warrant. It consequently suppressed all evidence not specifically covered by the search warrant. But Young argues that the district court should *also* have suppressed items that the warrant mentioned. He says (1) the warrant itself was not lawfully obtained, and (2) in any event, the unlawful elements of the search were so egregiously improper as to taint the entire search and require suppression of all the items taken. After reviewing the record of the circumstances surrounding the search compiled in a related state court proceeding, *State v. Valenzuela*, 130 N.H. 175, 536 A.2d 1252 (1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988), and after taking some additional evidence, the district court rejected these contentions. After reading the 16–volume record appendix before us, we conclude that the district court's determinations were legally correct.

## I.

### Background Facts

Because the legal questions before us are highly fact-specific, we shall first summarize the key facts, as the district court could lawfully find them. "The standard of review of an appeal from denial of a motion to suppress is that the decision will be upheld if any reasonable view of the evidence supports the trial court's deci-

sion." *United States v. Veillette*, 778 F.2d 899, 902 (1st Cir.1985), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). *See United States v. Kiendra*, 663 F.2d 349, 351 (1st Cir.1981); *United States v. Payton*, 615 F.2d 922, 923 (1st Cir.), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980).

1. In about June 1983, New Hampshire State Police Detective Sergeant Henry Carpenito and Federal Drug Enforcement Administration ("DEA") Agent Gerald Graffam began to investigate Young, whom they suspected of being a major drug dealer. In October 1983 they interviewed William Tobin. Tobin described to them how he had transported drugs for Young, how others had purchased drugs from Young, and the nature of Young's drug operation. The officers obtained from the telephone company, and from a lawfully authorized "pen register" device, records that showed that Young made many calls to persons with criminal convictions for drug offenses and whom reliable confidential sources described as still in the drug business.

2. In early January 1984, Carpenito asked a New Hampshire state court to authorize a wiretap on Young's residence telephone. He supported the application for the wiretap order with an affidavit describing records of several hundred phone calls made from Young's phone to different persons whom the affiant or reliable informants identified as having recently been, or as still being, involved in unlawful drug transactions. The affidavit also described Carpenito's meetings with Tobin and other informants, who described the drug activities of Young and his associates.

The court issued the wiretap order. The wiretap revealed that Young sometimes talked in a kind of code, often used aliases, and often asked callers to whom he was speaking in code to call him back at a public telephone. Carpenito, an experienced drug investigator, says he recognized the code, and that when, for example, Young spoke about making room for a large shipment of "lumber" that would arrive on January 13, Young really meant marijuana.

3. By Saturday, January 14, 1984, drug investigators were making plans to search Young's home. That morning state police arrested two persons working as confederates of Young, whom they saw drive a rented truck to Young's house and later depart. The officers feared that the arrestees might warn Young about an imminent search if they (the arrestees) made phone calls. One of the police officers, Lt. Brown, therefore called a state court judge and asked him about the consequences of holding the two incommunicado. The judge, Justice Gage of the Exeter District Court, explained to Brown that any evidence the two gave after being refused permission to make phone calls might be inadmissible in court.

4. Later in the same day Carpenito obtained, from the same Justice Gage, a search warrant for Young's residence. The warrant authorized a search for "marijuana, cocaine, records and ledgers of drug sales transactions, weight scales, drug paraphernalia, U.S. currency, safety deposit box keys."

5. On the morning of Sunday, January 15, Carpenito, along with Graffam and other federal and state law enforcement officers, began to search Young's home. They arrested Young at the start of the search. They continued the search through Sunday night, Monday, and Monday night, and ended it Tuesday evening. They seized nearly 70 pounds of cocaine, more than a ton of marijuana, LSD tablets, $200,000 cash, firearms and munitions, ledgers of drug transactions, and other records of drug activities and of various financial activities thought to be evidence of the drug transactions.

6. On Sunday, soon after the search began, a federal Internal Revenue Service agent, Edward Blair, heard about the search. On Monday morning he met Carpenito, by chance, as the two ate breakfast at a restaurant on the highway near Young's house. Sometime later on Monday, Blair took a group of federal tax agents to Young's house, and, walking past the police guards without identifying himself, he began to search for tax information. With other IRS agents, he went

through every room of Young's garage/office (next to the house), seizing the majority of the documents he found there. He also searched, though to a lesser degree, Young's main house. Blair took ten file drawers of records from the office, marked them for seizure, gave them to the state police, and later inspected them at state police offices.

Blair testified later that he had never read the search warrant or heard its terms. He said that he thought he had had permission to enter the house, that he thought police guards had let him enter because he "looked like" a government agent, and that he directed his search without consulting state officers. He testified that his search was intended both to help state officers understand financial materials and to conduct his own tax investigation, but he also testified that he did not actually help the state police identify or understand any records during the search.

7. The district court determined that Blair had behaved unlawfully. It suppressed all items seized to which the search warrant did not specifically refer. As we read the record, the suppressed items would include the tax information that Blair obtained, and other miscellaneous items (such as jewels, krugerrands, books, personal records and belongings) outside the warrant's scope.

## II.

### *The Legal Issues*

Young raises four legal issues. Having reviewed the record, we find each of them without legal merit. We shall briefly explain why.

■ A. *"Probable cause" for the search warrant.* Young argues that Carpenito's affidavit seeking authority for the wiretaps was invalid because it contained materially misleading, intentionally false, information. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). We suppose that Young makes this argument because he believes that, if it is true, the invalidity of the wiretap order could, in turn, make the search warrant

invalid, for the search warrant rested upon an affidavit that contained information from the wiretap. Even if we assume that we can apply *Franks* at one remove from the search warrant and also assume that the Constitution requires us to review a state's wiretap authorization as we would review a federal search warrant, we reject Young's position because the items to which Young points are either insignificant or not misleading. That is to say, if we excise (or otherwise appropriately adjust) all misleading statements from the affidavit, *Franks,* 438 U.S. at 171–72, 98 S.Ct. at 2684–85; *United States v. LaRouche Campaign,* 695 F.Supp. 1290, 1305 (D.Mass. 1988) (remedy under *Franks* is not "to disregard those statements entirely; rather, it is appropriate to reconsider the affidavit disregarding the falsities and supplemented by the omitted information"), there is still a more than adequate showing of "probable cause." Thus any misstatements are immaterial. *See Franks,* 438 U.S. at 171–72, 98 S.Ct. at 2684–85; *United States v. Cole,* 807 F.2d 262, 268 (1st Cir. 1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987). We discuss each alleged misstatement in turn:

1. *Carpenito's affidavit says that Tobin identified Milton S. Cash, Maurice Grenier, and Dennis Boudreau as three of Young's drug customers, whereas in fact Tobin identified the three customers as "Milt," "Big Moe from Manchester," and "Dennis," adding some description of their appearances and locations.*

This misstatement is not material. Carpenito's affidavit says that Young called Milton S. Cash, Maurice Grenier and Dennis Boudreau frequently; Carpenito describes these three from his own knowledge as persons with drug-related backgrounds; and the fact that Tobin also identified these three as persons actually involved in drug transactions with Young *helps* establish probable cause. Nonetheless, the reader of the affidavit would likely draw the relevant connections even if the affidavit had described Tobin as having used first names and locations and then had added that *Carpenito believed* Tobin

was speaking of Cash, Grenier and Boudreau. The affidavit also lists other persons and places Young phoned, which it independently ties to the drug business. Clarifying what Tobin said about the identities of these individuals, and what Carpenito inferred, would not impair the finding of "probable cause."

2. *The affidavit says Tobin "witnessed" a drug transaction at the home of a Young associate, but in fact, Tobin was simply in the house and "inferred" from the conduct of others that a transaction was taking place.*

The overstatement implied by the word "witnessed" is insignificant in the context of the affidavit.

3. *The affidavit fails to point out that one of Young's associates typically moved cocaine out of his house within 24 hours.*

This fact seems irrelevant.

4. *The affidavit says that Tobin said that a Young associate and codefendant handled marijuana for Young, but Tobin testified he knew nothing about marijuana handling.*

In fact, the affidavit does not say to whom the statement about marijuana is attributed; Carpenito, the affiant, may attribute it to another informant besides Tobin. In any event, excision of the statement would make no significant difference.

5. *The affidavit says Tobin said the "Second Coming Used Furniture Store" (a place that Young often telephoned) was a drug outlet, but Tobin later testified that he did not say this.*

The court need not have believed Tobin's later testimony. Regardless, the affidavit mentions *two* informants who said this, and it also describes how police found marijuana in furniture purchased at the store. Excision of the attribution to Tobin would make no significant difference.

6. *The affidavit wrongly implies that certain individuals acted as couriers for Young about the time of the Tobin interview, when in fact Tobin said they did so earlier.*

In fact, the affidavit is ambiguous as to the time when particular persons acted as couriers. It contains more than enough indication, however, of other contemporaneous drug deals by Young (*e.g.*, the phone calls).

7. *The affidavit omitted Tobin's comment that Young would not use his phone to conduct drug deals.*

In fact, the affidavit quoted Tobin accurately, and the search warrant affidavit explained accurately to the court what Tobin had said: that Young would speak a kind of code over the phone and use pay phones where possible to discuss the details of his drug transactions.

8. *The affidavit failed to state that Tobin was a drug addict, that he had had a "drug deal" dispute with Young, that law enforcement officers had promised Tobin immunity for cooperating with the investigation, that Tobin wanted $60,000 to boot, and that Carpenito did not believe Tobin's claim that Young had stopped drug dealing.*

■ The law does not require an officer swearing out an affidavit for a warrant to include all possible impeachment material. It need only explain that the officer has found the informant to be reasonably reliable. *See Illinois v. Gates*, 462 U.S. 213, 230–39, 103 S.Ct. 2317, 2328–33, 76 L.Ed. 2d 527 (1983). The affidavit did so. It also provided corroboration for much of what Tobin said, demonstrating reliability. *Gates*, 462 U.S. at 241–46, 103 S.Ct. at 2333–36; *LaRouche Campaign*, 695 F.Supp. at 1304–05. That is sufficient for "probable cause."

A reading of the entire 28–page affidavit in the totality of the circumstances, *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332, leaves us with the firm impression that the eight matters listed above, insofar as they show inaccuracies, are not material to a finding of "probable cause." *See United States v. Richardson*, 861 F.2d 291, 294 n. 3 (D.C. Cir.1988) (*per curiam*), *cert. denied*, —— U.S. ——, 109 S.Ct. 1325, 103 L.Ed.2d 593 (1989); *Cole*, 807 F.2d at 268; *United States v. Southard*, 700 F.2d 1, 10 (1st Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

■ B. *The "neutral and detached magistrate."* Young reminds us that on the afternoon of January 14, Lt. Brown of the state police phoned Justice Gage of the Exeter District Court and asked Gage about the legal effect of holding incommunicado for several hours two persons Lt. Brown had just arrested. Gage answered the question. A few hours later, Carpenito called on the same Justice Gage and obtained the search warrant. Young says that the first of these calls somehow biased Justice Gage, depriving him of that "neutral and detached" quality that the Fourth Amendment demands in one issuing a warrant. *See Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

We do not see how one can equate Gage's legal answer to the first call with loss of neutrality or detachment at the point of issuing the warrant. Although New Hampshire recognizes that judges should not make a practice of advising law enforcement officers on such matters— such advice should come from the attorney general's office, *see State v. Valenzuela,* 536 A.2d at 1266—the advice given here does not seem to us to have any significant bearing on Gage's disinterest when he considered the warrant application. *Cf. Shadwick v. City of Tampa,* 407 U.S. 345, 351, 92 S.Ct. 2119, 2123, 32 L.Ed.2d 783 (1972) (judge issuing warrant must act as a neutral member of the judicial branch, independent of the police or the prosecution); *Coolidge v. New Hampshire,* 403 U.S. 443, 449–53, 91 S.Ct. 2022, 2029–31, 29 L.Ed.2d 564 (1971) (officer issuing warrant must not be prosecutor).

Regardless, the conclusive answer to Young's argument lies in the district court's finding that there is *no* indication that Justice Gage, when he issued the search warrant, was aware that the investigation of Young was connected to the two arrestees regarding whom Brown had earlier called. The record supports this finding. There is some evidence that suggests that Justice Gage might have known that the police officer's call and Carpenito's later warrant application were connected: the affidavit says that Lt. Brown had arrested two persons earlier that day. On the other hand, the affidavit does not speak of the earlier phone call to Gage by Brown, nor does it mention that the two arrestees were held incommunicado. And there is no evidence that Gage was ever told the names (or even the gender) of the two persons Brown was discussing when he made the telephone call. In our view, given these omissions, the remark in the affidavit is insufficient to make the district court's finding of no connection "clearly erroneous."

■ C. *Search beyond the warrant's scope: the nighttime search.* Young argues that the search of his house was unlawful because the searching officers continued their search through Sunday and Monday nights, whereas the warrant commanded a search only "in the daytime." The New Hampshire courts, however, have held this language in a warrant to permit a search that *continues* at night as long as it *begins* in the day. *Valenzuela,* 536 A.2d at 1266. The language of the somewhat ambiguous warrant permits this reading. It says "We therefore command you in the daytime to make an immediate search of Stephen D. Young residence ...." The word "immediate" following "daytime" supports a reading that "daytime" limits the time of initiating the search. At the same time, the reason for limiting nighttime searches—preventing abrupt intrusions on sleeping residents in the dark, *see Jones v. United States,* 357 U.S. 493, 498, 78 S.Ct. 1253, 1256, 2 L.Ed.2d 1514 (1958); *United States v. Ravich,* 421 F.2d 1196, 1201 (2d Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970)—does not apply once officers have begun the search in the daytime and (as here) have removed the residents. Indeed, to interrupt a search, perhaps to apply for a new warrant each day while guarding the house against entry each night, *see Segura v. United States,* 468 U.S. 796, 808–10, 104 S.Ct. 3380, 3387–88, 82 L.Ed.2d 599 (1984), would often increase, rather than diminish, inconvenience to residents, by extending the total time during which their residence was subject to police intrusion. Thus, we think

the New Hampshire courts' interpretation of the warrant is reasonable.

That being so, we are aware of no legal reason why the search could not continue at night. We have found no legal authority demanding that the warrant's terms in this respect be absolutely clear and unambiguous. Nor are we aware of anything in Fed.R.Crim.P. 41 or the Constitution that forbids continuing a search at night, at least when doing so is reasonable. *See United States v. Schoenheit*, 856 F.2d 74, 77 (8th Cir.1988); *United States v. Burgard*, 551 F.2d 190, 193 (8th Cir.1977); *United States v. Joseph*, 278 F.2d 504, 505 (3d Cir.) *(per curiam )*, *cert. denied*, 364 U.S. 823, 81 S.Ct. 59, 5 L.Ed.2d 52 (1960); 68 Am.Jur.2d, *Searches and Seizures* § 110 (1973 & Cum.Supp.1989); 26 A.L.R. 3d 951, 971 (1969 & Supp.1988); 58 A.L.R. Fed. 757, 763 (1982 & Supp.1988). *Cf. United States v. Gagnon*, 635 F.2d 766, 768–69 (10th Cir.1980) (propriety of a search continuing into the night is judged by its reasonableness), *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981); *State v. Chaisson*, 125 N.H. 810, 486 A.2d 297, 303 (1984) (similar). Given the great amount of contraband found, the difficulties of finding some of it, and the absence of evidence showing special inconvenience to residents, we think the continuation of the search into the night was reasonable here.

■ D. *Search beyond the warrant's scope: Blair's search.* Young argues that the government's search of his house was so broad and indiscriminate that we should label it a "general search" and suppress *all* the evidence that law enforcement officials seized, including evidence within the warrant's scope. The Fourth Amendment was adopted in part to ward off the menace of "general searches." *See Maryland v. Garrison* 480 U.S. 79, 84, 107 S.Ct. 1013, 1017, 94 L.Ed.2d 72 (1987); *Andresen v. Maryland*, 427 U.S. 463, 479–80, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976); *Marron v. United States*, 275 U.S. 192, 195–96, 48 S.Ct. 74, 75–76, 72 L.Ed. 231 (1927); *United States v. Fuccillo*, 808 F.2d 173, 175 (1st Cir.), *cert. denied*, 482 U.S. 905, 107 S.Ct.

2481, 96 L.Ed.2d 374 (1987); *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir.1980). But we disagree with Young's argument.

First, the warrant itself, as we have discussed above, was lawful. It was obtained through lawful procedures. *See Johnson*, 333 U.S. at 14, 68 S.Ct. at 369. The showing of "probable cause" was ample. *See Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. It described the objects to be seized with sufficient precision. *See Fuccillo*, 808 F.2d at 176–77; *Abrams*, 615 F.2d at 544–45; *Montilla Records of Puerto Rico, Inc. v. Morales*, 575 F.2d 324, 326–27 (1st Cir. 1978).

Second, although Agent Blair seized many items outside the warrant's scope, "[u]nlawful seizure of items outside a warrant does not *alone* render the *whole* search invalid and require suppression and return of *all* documents seized, *including those lawfully taken pursuant to the warrant.*" *Marvin v. United States*, 732 F.2d 669, 674 (8th Cir.1984) (emphasis added). *Accord United States v. Tamura*, 694 F.2d 591, 597 (9th Cir.1982); *United States v. Heldt*, 668 F.2d 1238, 1259–60 (D.C.Cir. 1981) *(per curiam )*, *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982); *Abrams*, 615 F.2d at 550 (Campbell, J., concurring) ("It is clear that overzealous execution [of a search, as opposed to insufficient particularity in the warrant,] requires suppression only of any materials seized outside of the warrant's authority (and the fruits of any such improperly seized material)."). In this case, the district court suppressed all items that were unlawfully seized, *i.e.*, those whose seizure was not authorized by the terms of the warrant.

Third, this is not one of those unusual cases where suppression of all the evidence seems required because the lawful and unlawful parts of the search were inextricably intertwined, or where the lawful part seems to have been a kind of pretext for the unlawful part. *See United States v. Medlin*, 842 F.2d 1194, 1198–99 (10th Cir. 1988) (officers' "flagrant disregard" for terms of warrant renders entire search illegal); *United States v. Rettig*, 589 F.2d

418, 423 (9th Cir.1978) (all evidence suppressed where warrant served as pretext to look for items not described in it). Here, the activities of Agent Blair seem reasonably segregable from those of the other officers. The search was designed as a drug search, not as an excuse for a tax record search. The chance pre-search contact between Blair and the drug officers does not require the district court to find collusion. Blair did not ask permission to enter, and he searched without consulting the drug investigators. Blair behaved with disregard for the warrant, but the drug investigators were instructed as to the warrant's terms and limitations by Sgt. Carpenito, and they appear to have abided by them.

All this is to say that, despite the large number of tax records unlawfully seized, the search here more closely resembles those cases in which *lawfully* seized items have been held admissible than it does those few cases holding the contrary. *Compare Medlin*, 842 F.2d at 1198–1200 (*all* items suppressed); *Rettig*, 589 F.2d at 423 (*all* items suppressed), *with Marvin*, 732 F.2d at 674–75 (*refusing* to suppress items covered by the warrant); *United States v. Whitten*, 706 F.2d 1000, 1009–10 (9th Cir.1983) (seizure of over a thousand photographs and two boxes containing personal letters and documents did *not* constitute "flagrant disregard"), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); *Tamura*, 694 F.2d at 597 (*refusing* to suppress items covered by warrant); *Heldt*, 668 F.2d at 1269 (*no* total suppression where agents made "a good faith attempt to stay within the boundaries" of the warrant, even though 50 other agents searched without adequate preparation and even though "a majority of documents seized might turn out not to qualify for inclusion on more leisurely reflection.").

Indeed in *Medlin*, to which Young points for his strongest support, the appellate court affirmed a district court finding of "general search" based on the fact that state agents, wanting to search a house for stolen property, relied on a warrant for stolen firearms obtained by federal agents, and then themselves searched (unlawfully)

for, and took, many other apparently stolen items. 842 F.2d at 1195–96. One might reasonably have seen the federal agents in *Medlin* as a cat's paw for the unlawful search that followed. Here, to the contrary, we are asked to overturn a district court finding that the lawful and unlawful portions of the search were reasonably separate. We believe the district court could have seen the unlawful part of the search here, not as in any sense driving or motivating the rest, but rather as being quite separate from the primary drug search. The difference is the difference between a cat's paw and a dog's tail: in *Medlin* the court could view the *unlawful* part of the search as basic, primary, motivating, so that it contaminated the lawful part; here the court could view the *lawful* part as basic while the unlawful part was segregable. For this reason, the fact that Blair searched unlawfully does not require the district court to have found that the drug investigators' search was also invalid.

*For these reasons the decisions of the district court are*

*Affirmed.*