# United States Court of Appeals
## For the First Circuit

No. 06-1683

UNITED STATES OF AMERICA,

Appellee,

v.

STEVEN McCARTY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Lynch, Circuit Judges.

Jeffrey M. Silverstein, with whom Russell, Silver &
Silverstein was on brief, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D.
Silsby, United States Attorney, was on brief, for appellee.

February 2, 2007

**TORRUELLA, Circuit Judge.** Steven McCarty ("McCarty") was charged in an indictment with possessing an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5871, and with possessing a firearm after having previously been committed to a mental institution in violation of 18 U.S.C. § 922(g)(4). McCarty moved to suppress certain statements and evidence he claimed were obtained in violation of the Fourth and Fifth Amendments. The court denied the motion. McCarty then entered a guilty plea conditioned on his right to appeal the denial of the motion to suppress. The court sentenced McCarty to thirty-six months in prison, to be followed by three years of supervised release. McCarty now appeals the denial of the motion to suppress and his sentence. After careful consideration, we affirm.

## I. Background

On July 10, 2004, at 4:18 P.M., Police Officer[1] Brame ("Brame") received a complaint from a woman identifying herself as McCarty's ex-girlfriend. She told Brame that she had recently been to McCarty's apartment to retrieve her possessions, that McCarty was in possession of marijuana plants, and that McCarty had "vaguely" threatened her with a sawed-off shotgun. Brame told Detective Goss ("Goss") about the matter; Goss called the woman back, and asked her to come into the police station. After

---

[1] Unless otherwise noted, all police officers and detectives referred to in this opinion are from the City of Waterville Police Department.

interviewing the woman and her sister and learning that McCarty had been recently institutionalized for mental illness, Goss drafted a warrant application to search McCarty's apartment. Goss brought the warrant application to a state district attorney for approval, and then presented the application to a state complaint justice. While Goss was seeking approval of the warrant, Police Officer Rumsey ("Rumsey") contacted Bureau of Alcohol, Tobacco, and Firearms ("BATF") Agent McSweyn ("McSweyn"), and informed him that they would be executing a search warrant on an apartment thought to contain firearms. The state complaint justice issued the warrant at approximately 8:30 P.M.[2] A box on the warrant stated, "This warrant shall be executed between the hours of 7:00 AM and 9:00 PM."

Brame, Goss, Rumsey, and three other police officers proceeded to McCarty's apartment, arriving at 8:56 P.M. At 8:57 P.M., Brame knocked on McCarty's door, announced his identity, and stated that he had a search warrant. After gaining entry, the officers encountered McCarty, handcuffed him, and led him to a couch in his living room. The officers began to search the apartment at 8:58 P.M. The officers found marijuana and marijuana

---

[2] The warrant authorized the police to search for drugs, drug paraphernalia, and evidence of ownership, distribution, or cultivation of drugs. Police Officer Goss stated that he did not address the sawed-off shotgun in the warrant application because it was not prohibited by Maine law. Neither party challenges the scope of the warrant.

paraphernalia in the apartment. While searching behind the couch in McCarty's living room, Goss found a duffle bag containing a 12-gauge sawed-off shotgun. When McCarty saw Goss uncover the gun, he stated that it was an antique known as "the old peacemaker," and that it was in the same condition as when it was manufactured. McCarty then asked the police officers for permission to smoke a cigarette, which he was allowed to do. Upon returning to the apartment, McCarty complained that his handcuffs were too tight, and Goss removed them. Goss then seated McCarty at a table approximately four to five feet away from the duffle bag containing the gun.

McSweyn arrived and conferred with Goss. Goss told McSweyn that he had found a gun, and showed him the shotgun. When Goss showed McSweyn the shotgun, McCarty stated, "That's mine. It's an old peacemaker." McSweyn measured the gun, and determined that the barrel length was eleven inches.

McSweyn then began to question McCarty. At this time, a member of the search team, Police Officer Burbank, was standing next to McCarty. Before asking him any questions, McSweyn did not read McCarty any Miranda warnings, but instead told McCarty that he was not under arrest, that he was free to leave whenever he wanted, and that he did not have to answer questions. McCarty nevertheless told McSweyn that he had received the gun from his grandfather, that he had altered it to make it easier to fire and that he had in

-4-

fact fired the weapon, and that he had not registered the gun with the BATF. McCarty also repeated his assertion that the gun was an antique. The search concluded at 10:35 P.M., when all law enforcement officers left the apartment.

On February 9, 2005, a grand jury indicted McCarty on one count of possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5871, and one count of possession of a firearm after having previously been committed to a mental institution in violation of 18 U.S.C. § 922(g)(4). McCarty was arrested on April 14, 2005. On May 9, 2005, McCarty filed a motion to suppress all evidence collected at his apartment because the search warrant was defectively executed when officers remained past 9:00 P.M., and to suppress all statements McCarty made to Goss and McSweyn because McCarty was not informed of his <u>Miranda</u> rights.[3] The motion was referred to a magistrate judge, who recommended that it be denied. The district court accepted the recommendation of the magistrate judge and issued an order denying the motion to suppress. On October 12, 2005, McCarty pled guilty pursuant to a conditional plea reserving his rights to appeal the denial of the motion to suppress.

---

[3] McCarty also moved to suppress evidence collected at his apartment because he alleged that officers failed to knock and announce themselves before executing the warrant. The court denied this motion, and McCarty does not raise it on appeal.

McCarty's amended pre-sentence report ("PSR") calculated his base offense level at 20, U.S.S.G. § 2K2.1(a)(4)(B) (2003).[4] The PSR applied a two-level enhancement under U.S.S.G. § 2K2.1(b)(3) (2003) because the offense involved a "destructive device," resulting in a total offense level of 22. The PSR also determined that McCarty had a criminal history category of I.

McCarty raised seven objections to the PSR, among them that the application of the § 2K2.1(b)(3) enhancement constituted impermissible double counting, and that in any case, he did not qualify for the enhancement because he did not possess a "destructive device." The court denied the objections and applied the § 2K2.1(b)(3) enhancement. The court then applied a three-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1 (2003), resulting in a total offense level of 19, which translates to a recommended Sentencing Guidelines range of thirty to thirty-seven months in prison. The court sentenced McCarty to thirty-six months in prison on each count, to be served concurrently, followed by three years of supervised release.

---

[4] The district court chose to apply the Sentencing Guidelines as they existed prior to the November 1, 2004 amendments because they would result in a more lenient sentence for McCarty and because of ex post facto concerns. Neither McCarty nor the Government appeals this decision, and we do not disturb it on appeal.

## II. Discussion

### A. Motion to Suppress Evidence Collected at McCarty's Apartment

McCarty contends that the district court should have suppressed the evidence collected by the police at his apartment on July 10, 2004, because the search warrant obtained by police stated that it could only be executed between 7:00 A.M. and 9:00 P.M., and police remained at his apartment until 10:35 P.M. We review a district court's decision to deny a motion to suppress de novo as to legal conclusions and for clear error as to factual findings. United States v. Vongkaysone, 434 F.3d 68, 73 (1st Cir. 2006).

The Fourth Amendment prohibits "unreasonable searches and seizures." Even a search conducted pursuant to a warrant may be "unreasonable" given the manner in which the search has been conducted. See, e.g., United States v. Ramírez, 523 U.S. 65, 71 (1998) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful."); cf. United States v. Young, 877 F.2d 1099, 1105 (1st Cir. 1989) ("[Nothing] forbids continuing a search at night, at least when doing so is reasonable.").

McCarty complains that the search of his apartment was unreasonable because it was conducted, in part, at night, whereas the warrant authorizing the search stated that the search could only be executed during the daytime. McCarty's concern about nighttime searches is not unprecedented, see, e.g., Jones v. United

States, 357 U.S. 493, 498-99 (1958) ("[I]t is difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home that occurred in this instance."), but nighttime searches are not per se unreasonable; rather, we apply a traditional reasonableness test to the search. Young, 877 F.2d at 1105.

In this case, the search warrant provided that nighttime began at 9:00 P.M. See also Me. R. Crim. P. 41(h) ("[A] warrant shall direct that it be executed between the hours of 7 a.m. and 9 p.m. unless the judge or justice of the peace . . . authorizes its execution at another time.").[5] The search warrant team gained entry to the apartment at 8:57 P.M. and began its search at 8:58 P.M. Thus, even though they were cutting it very close, the police did in fact commence the search during "daytime" as defined by the warrant. The search continued until 10:35 P.M., but we have held that a search which began during the daytime but which continued through the nighttime is not necessarily unreasonable. Young, 877 F.2d at 1104-05; see also State v. Sargent, 875 A.2d 125, 127-28 (Me. 2005) (finding no grounds for suppression where a search began

_____

[5] The Government argues that federal law should govern the question of whether a search warrant has been executed during the nighttime, and points out that Fed. R. Crim. P. 41(a)(2)(B) defines nighttime as beginning at 10:00 P.M. Because we find that the search was reasonable if nighttime begins at 9:00 (as defined by Maine law), the search must also be reasonable if nighttime begins at 10:00 (as defined by federal law), and thus we need not reach this issue. We express no opinion as to whether state law or federal law would control in these circumstances.

-8-

before 9:00 P.M. but concluded at 11:00 P.M.). In fact, the search of McCarty's apartment was significantly less intrusive than the valid search conducted in Young, which began in the morning, and continued throughout the night and for two additional days. 877 F.2d at 1104.

Furthermore, we have stated that:

> [i]n considering the question of reasonableness [of a search], a court must assess the totality of the circumstances, including "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."

United States v. Cofield, 391 F.3d 334, 336 (1st Cir. 2004). Here, there is no evidence that McCarty was roused from his sleep, or that the search was particularly intrusive. To the contrary, when the search team knocked on the door, McCarty's roommate opened it, and the police found McCarty standing awake in his living room. McCarty was allowed a considerable degree of freedom during the search, which by all accounts was conducted in a very professional manner. Finally, there is no dispute that the search was well-justified given the report of weapons and drugs by McCarty's ex-girlfriend.

Thus, we conclude that the search of McCarty's apartment was reasonable, and that the district court was correct to have

denied McCarty's motion to suppress the evidence collected from his apartment.[6]

## B. **Motion To Suppress McCarty's Statements**

McCarty argues that his statements to the police and the BATF should be suppressed because they were obtained in violation of <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966). We review the district court's denial of McCarty's motion to suppress <u>de novo</u> as to legal conclusions and for clear error as to factual findings. <u>United States</u> v. <u>Rojas-Tapia</u>, 446 F.3d 1, 3 (1st Cir. 2006).

In <u>Miranda</u>, the Court held that prior to interrogating a suspect who is in custody, that suspect must be advised of certain rights in order to protect his or her Fifth Amendment right against self-incrimination. 384 U.S. at 467-68. Thus, in order to claim a <u>Miranda</u> violation, a suspect must be in custody, <u>Pasdon</u> v. <u>City of Peabody</u>, 417 F.3d 225, 227 (1st Cir. 2005), and the suspect must have been interrogated, <u>Caputo</u> v. <u>Nelson</u>, 455 F.3d 45, 49-50 (1st Cir. 2006).

McCarty made the first set of statements that he claims should be suppressed while he was handcuffed. As such, there can be no question that McCarty made those statements while he was in custody. <u>See</u> <u>New York</u> v. <u>Quarles</u>, 467 U.S. 649, 655 (1984)

---

[6] Because we conclude that the search was reasonable, we see no need to reach the constitutional issue of what remedy we might apply to an unreasonable search in the wake of <u>Hudson</u> v. <u>Michigan</u>, 126 S. Ct. 2159 (2006) (declining to apply the exclusionary rule to a violation of the knock-and-announce requirement).

(finding that a suspect was in custody because he "was surrounded by at least four police officers and was handcuffed when the questioning at issue took place").  Thus, we must determine whether an "interrogation" occurred.  An interrogation occurs when there is "express questioning, . . . [or] any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  The facts of this case are similar to those in United States v. Genao, where we found that no interrogation occurred when an officer showed a suspect drugs and guns seized from the suspect's house and the suspect blurted out an inculpatory statement.  281 F.3d 305, 308, 310 (1st Cir. 2002).  Likewise, in the present case, Officer Goss "revealed and inspected the shotgun in [McCarty's] immediate presence."[7]  Appellant's Br. at 23.  After seeing the shotgun, McCarty blurted out that the gun was a "peacemaker" and began to tell Goss about its origins.  We find that Goss' removal of the gun from behind the couch was not interrogation, and accordingly, there can be no Miranda violation.

Similarly, the second set of statements that McCarty claims should be suppressed were not the product of interrogation. Like the first set of statements, the police did not direct any

---

[7]  Revealing the shotgun in McCarty's presence does not appear to have been Goss' plan; rather, the shotgun happened to be discovered behind the couch on which McCarty was seated.

questions to McCarty; rather, Goss simply showed the gun to Agent McSweyn, who proceeded to measure the gun in McCarty's presence. McCarty then told the officers, unprompted, that the gun was his. Given Goss' uncontradicted testimony that neither he nor McSweyn cast so much as an inquiring glance at McCarty, we find that McCarty's unsolicited statement was not the product of interrogation, and thus there was no Miranda violation.

The third set of statements presents a different question. While police were concluding the search, Agent McSweyn asked McCarty questions about the origins and ownership of the shotgun. There is little debate that these questions were designed to elicit a response, and as such, they constitute interrogation. Innis, 446 U.S. at 301. However, before finding a Miranda violation, we must determine whether McCarty was "in custody." Pasdon, 417 F.3d at 227. In order to determine whether McCarty was in custody, we look to see if "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983). When McSweyn began to question McCarty, McCarty was no longer handcuffed. Although Agent McSweyn and one additional police officer remained in McCarty's presence, McSweyn explained to McCarty that he was not under arrest, that he was free to leave at any time, and that he did not have to answer any questions. It is clear that there was no arrest here and we conclude that this does

not constitute a "restraint on freedom of movement" that would normally be associated with an arrest. See Podlaski v. Butterworth, 677 F.2d 8, 9 (1st Cir. 1982) (finding that a suspect was not in custody where "the defendant [was not] told he was under arrest; . . . was in a home familiar to him; . . . [and] police activity was consistent with investigatory questioning"). Accordingly, because McCarty was not in custody while being questioned by McSweyn, there was no violation of Miranda. Because we have found no Miranda violations, the district court did not err in denying McCarty's motion to suppress.

## C. Application of U.S.S.G. § 2K2.1(b)(3)

McCarty's final salvo is that the district court incorrectly calculated his total offense level under the Sentencing Guidelines when it included the § 2K2.1(b)(3) enhancement for a "destructive device." Although the Sentencing Guidelines are now advisory rather than mandatory, see United States v. Booker, 543 U.S. 220, 245-46 (2005), we continue to emphasize their importance in sentencing decisions and require courts to correctly perform Guidelines calculations. United States v. Jiménez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) ("In most cases, this will mean that the district court will have to calculate the applicable guidelines range including the resolution of any factual or legal disputes necessary to that calculation . . . ."). We review Guidelines calculations de novo as to legal conclusions, and for clear error

as to the sentencing court's factual findings. United States v. Robinson, 433 F.3d 31, 35, 38 (1st Cir. 2005).

McCarty first argues that the application of the § 2K2.1 (b)(3) enhancement is impermissible because it constitutes double counting, inasmuch as both the enhancement and the calculation of the base offense level, § 2K2.1(a)(4)(B), are based on his possession of a sawed-off shotgun. We have often said that double counting is "less sinister than the name implies." See, e.g., United States v. Lilly, 13 F.3d 15, 19 (1st Cir. 1994) (quoting United States v. Zapata, 1 F.3d 46, 47 (1st Cir. 1993)). This is because two (or more) guidelines will often rely on the same underlying facts, although accounting for different sentencing concerns. See, e.g., United States v. Wallace, 461 F.3d 15, 36 (1st Cir. 2006) (applying § 2K2.1(a)(4)(B) to account for unlawful possession of a weapon and § 5K2.6 to account for the way in which the weapon was used). Thus, when

> neither an explicit prohibition against double counting nor a compelling basis for implying such a prohibition exists, clearly indicated adjustments for seriousness of the offense and for offender conduct can both be imposed, notwithstanding that the adjustments derive in some measure from a common nucleus of operative facts.

Lilly, 13 F.3d at 20.

Here, there is no explicit prohibition against double counting; to the contrary, U.S.S.G. § 2K2.1 cmt. n.11 (2003) explicitly states: "A defendant whose offense involves a

-14-

destructive device receives both the base offense level from the subsection applicable to a firearm listed in 26 U.S.C. § 5845(a) (e.g., subsection . . . (a)(4)(B)), and a two level enhancement under subsection (b)(3)." Nor is there a compelling basis for implying such a prohibition. Whereas the sentencing guideline for the base offense, § 2K2.1(a)(4)(B), covers the wide range of weapons found in 26 U.S.C. § 5845(a), the § 2K2.1(b)(3) enhancement is intended to provide harsher punishment for destructive devices, a narrower set of more dangerous weapons. See § 2K2.1 cmt. n. 11 ("Such [destructive] devices pose a considerably greater risk to the public welfare than other National Firearms Act weapons."). For example, possession of a silencer might qualify a defendant for the § 2K2.1(a)(4)(B) base offense level because a silencer is listed as a firearm in 26 U.S.C. § 5845(a), but would not qualify the defendant for the § 2K2.1(b)(3) enhancement because a silencer is not a "destructive device." See 26 U.S.C. § 5845(f) (defining destructive devices). Thus, because the guidelines for the base offense and the enhancement account for different sentencing concerns, we see no double-counting problem with using both guidelines to calculate McCarty's total offense level.

McCarty also argues that the weapon he possessed did not qualify as a destructive device. McCarty was found to possess a shotgun with a barrel length of eleven inches, a barrel diameter of over one-half inch, and an overall length of twenty-four inches.

-15-

26 U.S.C. § 5845(f) includes in the definition of a destructive device:

> any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes.

McCarty suggests that this subsection excludes all shotguns from the definition of a destructive device. McCarty is clearly wrong, as § 5845(f) specifically defines a destructive device as a device with a barrel in excess of one half inch and which expels projectiles, which is an accurate description of the sawed-off shotgun he possessed. Furthermore, § 5845(f) specifically excludes from the definition of a destructive device a "shotgun or shotgun shell <u>which the Secretary [of the Treasury] finds</u> is generally recognized as particularly suitable for sporting purposes." (emphasis added). The phrase "which the Secretary finds" logically modifies "shotgun or shotgun shell." Thus, § 5845(f) excludes from the definition of destructive device only those shotguns the Secretary finds suitable for sporting purposes, and implies that other shotguns are considered destructive devices.

McCarty also contends that his shotgun is suitable for sporting purposes, and thus cannot be a destructive device. However, the relevant question here, according to § 5845(f), is

whether the Secretary of the Treasury has found that a shotgun is suitable for sporting purposes. The Government avers that the Secretary of the Treasury has not recognized sawed-off shotguns as "useful for sporting purposes," and McCarty has offered no evidence to the contrary.[8] The Secretary's decision to not recognize sawed-off shotguns as suitable for sporting purposes has ample support; courts have found that sawed-off shotguns, such as the one possessed by McCarty, "lack usefulness except for violent and criminal purposes," United States v. Fortes, 141 F.3d 1, 8 n.3 (1st Cir. 1998), and that they "hinder[] rather than aid[], the precision involved in sport shooting," United States v. Linson, 276 F.3d 1017, 1019 (8th Cir. 2002).

Finally, McCarty notes that § 5845(f) excludes from the definition of a destructive device a firearm "which is . . . an antique." McCarty claims that his gun was an antique, and that the Government has failed to rebut this assertion. However, McCarty pled guilty to a violation of 26 U.S.C. § 5861(d), which required

---

[8] We see no merit to McCarty's claim that "to make a judicial determination in the place of the Secretary regarding the suitability of a shotgun for sporting purposes would violate the separation of powers doctrine." Appellant's Br. at 26. We note that § 5845(f) does not state that it allows all shotguns for sporting purposes except for those prohibited by the Secretary. Rather, § 5845(f) prohibits any destructive device except for those shotguns allowed by the Secretary for sporting purposes. Thus, in the present case, we are not substituting our judgment for that of the Secretary, we are merely noting that he has not acted pursuant to his authority to deem the type of shotgun possessed by McCarty as suitable for sporting purposes.

-17-

him to have possessed a firearm, as defined by 26 U.S.C. § 5845(a). Section 5845(a) defines a firearm as including a "shotgun having a barrel or barrels of less than 18 inches in length," but excludes an "antique firearm." Thus, by pleading guilty to possessing a firearm as defined in § 5845(a), McCarty pled guilty to possessing a weapon which was, by definition, not an "antique firearm." Accordingly, the district court properly concluded that for sentencing purposes, the weapon that McCarty possessed was not an antique firearm. We conclude that because the weapon that McCarty possessed was a destructive device as defined in § 5845(f), the court properly applied the two-level enhancement under U.S.S.G. § 2K2.1(b)(3) (2003).

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

**Affirmed**.